**BOB JONES UNIVERSITY, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 76–775.

United States District Court, D. South Carolina, Greenville Division.

Dec. 26, 1978.

Wesley M. Walker, Leatherwood, Walker, Todd & Mann, J. D. Todd, Jr., O. Jack Taylor, Jr., Greenville, S. C., for plaintiff.

Steven Shapiro, Martin B. Whitaker, Attys., John F. Murray, Chief, Civ. Trial Section, Southern Region, Tax Div., Dept. of Justice, Washington, D. C., J. D. McCoy, III, Asst. U. S. Atty., Greenville, S. C., for defendant.

## FINDINGS OF FACT CONCLUSIONS OF LAW AND ORDER

CHAPMAN, District Judge.

Plaintiff instituted this action to recover the amount of $21.00 which it paid in federal income taxes under the Federal Unemployment Tax Act (F.U.T.A.). The sum that plaintiff seeks to be refunded belies the importance of this litigation, since resolution of the suit requires a determination of whether plaintiff qualifies as a tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3).

The controversy between plaintiff and the government originated in July, 1970, when the Internal Revenue Service publicly announced that it would no longer allow tax exempt status to private schools that practiced racial discrimination or allow gifts to such schools as charitable deductions. By letter dated November 30, 1970, the plaintiff was formally notified of this change and informed that the IRS would challenge the tax exempt status of private schools which practice racial discrimination in their admissions policies. Unable to pro-

cure an assurance of tax exemption through administrative means, the plaintiff, in September 1971, instituted an action in this court to enjoin the IRS from revoking its tax exempt status. That suit culminated in *Bob Jones University v. Simon,* 416 U.S. 725, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974), in which the Supreme Court held that the Anti-Injunction Act of the Internal Revenue Code of 1954, 26 U.S.C. § 7421(a), prohibited the plaintiff from obtaining judicial review by way of injunctive action before the assessment or collection of any tax. The Supreme Court went on to suggest that a proper procedure for plaintiff to gain judicial review would be for plaintiff to pay " . . . an installment of FICA [Social Security] of FUTA [Federal Unemployment] taxes, exhaust the Service's internal refund procedures, and then bring suit for a refund." 416 U.S. 725, 746, 94 S.Ct. 2038, 2051, 40 L.Ed.2d 496.

On April 16, 1975, the IRS notified plaintiff of the proposed revocation of its exempt status. Official revocation came on January 19, 1976, and was made effective from December 1, 1970. Subsequently, plaintiff filed FUTA returns for the period from December 1, 1970, to December 31, 1975, and paid a tax totalling $21.00 on one employee for the calendar year of 1975. The plaintiff's request for a refund was denied and plaintiff instituted this suit. In its answer to the amended complaint the government counterclaimed for approximately $490,000.00 that it had purportedly determined was due on the returns filed by plaintiff. In its Order filed October 6, 1977, this Court determined that the counterclaim was not dismissible under Rule 12(b)(6) of the Federal Rules of Civil Procedure but granted plaintiff's motion to sever, for a separate trial, those issues raised by defendant's counterclaim other than the tax status issue presented by plaintiff's amended complaint.

On May 10, 1978, the matter of plaintiff's tax exempt status was tried before the Court without a jury. After reviewing the testimony, depositions, admissions, interrogatories, exhibits, pleadings, and briefs of record and studying the applicable law, the Court, pursuant to Rule 52 of the Federal Rules of Civil Procedure, makes the following:

## FINDINGS OF FACT

1. Plaintiff was founded in Florida in 1927, moving to its present location in Greenville, South Carolina in the late 1940's. Plaintiff was incorporated as an eleemosynary corporation under the laws of South Carolina on November 20, 1952, for the following purposes, as stated in its Preamble and contained in its Certificate of Incorporation:

> The general nature and object of the corporation shall be to conduct an institution of learning for the general education of youth in the essentials of culture and in the arts and sciences, giving special emphasis to the Christian religion and the ethics revealed in the Holy Scriptures, combating all atheistic, agnostic, pagan and so-called scientific adulterations of the Gospel, unqualifiedly affirming and teaching the inspiration of the Bible (both Old and New Testaments); the creation of man by the direct act of God; the incarnation and virgin birth of our Lord and Saviour, Jesus Christ; His identification as the Son of God; His vicarious atonement for the sins of mankind by the shedding of His blood on the Cross; the resurrection of His body from the tomb; His power to save men from sin; the new birth through the regeneration by the Holy Spirit; and the gift of eternal life by the grace of God.

2. Plaintiff's constitution and bylaws provide that, in the event of the dissolution of plaintiff, its residual assets are to be turned over to another organization which has been determined to be exempt from Federal income tax as an organization described in Section 501(c)(3) of the Internal Revenue Code, for use of one or more of its exempt purposes, or to the Federal, State or local government, for use of one or more public purposes.

3. Plaintiff is not affiliated with any religious denomination, and, in addition, re-

ceives no aid from local, state, or federal government. Plaintiff accepts students from kindergarten through college and graduate school, offering approximately fifty degrees. It also offers a nondegree, noncredit program entitled The Institute of Christian Service to teach the principles of the Bible and train Christian character. Plaintiff enrolls approximately 5,000 students nearly one half of which are studying for the ministry or preparing to teach in Christian schools.

4. The plaintiff is dedicated to the teaching and propagation of its fundamentalist religious beliefs. Everything taught at plaintiff is taught according to the Bible. Although students may be exposed to theories that are contrary to Biblical scripture, plaintiff's teachers instruct them to disregard these theories and teach the Bible's literal language as being the only true account. The cornerstone of plaintiff institution is Christian religious indoctrination, not isolated academics.

In attempting to accomplish its purpose of training Christian leadership, the plaintiff follows the teachings of the Bible in every instance where literature or philosophy vary from the "word of God" as set forth in the Bible. This is done so that a student can learn to distinguish between that which is of God and that which is of an "anti-God" mind and combat the latter. At plaintiff, every class, every cultural event, and every athletic contest opens with prayer. Fifteen minutes at the close of each day is devoted to gathering together in small groups for prayer. Every teacher, no matter what are his academic credentials, is required to be a "born again" Christian, who must testify to at least one saving experience with Jesus Christ, and who must consider his mission at plaintiff to be the training of Christian character. Any instructor, who fails to believe in or carry out the essentials of plaintiff's Preamble, is dismissed.

5. Student applicants to plaintiff are screened as to their religious beliefs. Plaintiff has extensively enacted a multitude of disciplinary rules in line with its religious beliefs. These rules appear in a student handbook and address almost every facet of a student's life at plaintiff. Upon entry into the plaintiff, the new student has these rules of conduct reviewed for him at a "rules meeting" and is required to sign a statement that he will abide by these rules and regulations. A small sample of these rules provides: The institution does not permit dancing, card playing, the use of tobacco, movie-going, and other such forms of indulgences in which wordly young people often engage; no student will release information of any kind to any local newspaper, radio station, or television station without first checking with the University Public Relations Director; students are expected to refrain from singing, playing, and, as far as possible, from "tuning-in" on the radio or playing on the record player jazz, rock-and-roll, folk rock, or any other types of questionable music; and, no young man may walk a girl on campus unless both of them have a legitimate reason for going in the same direction.

6. A primary fundamentalist conviction of the plaintiff is that the Scriptures forbid interracial dating and marriage. Detailed testimony was presented at trial elucidating the Biblical foundation for these beliefs. The Court finds and the defendant has admitted that plaintiff's beliefs against interracial dating and marriage are genuine religious beliefs.

7. From January 1, 1975, to May 29, 1975, plaintiff did not accept applications from unmarried black students unless the applicant had been a staff member of the University for four years or longer; married black students were permitted to enroll. During this period, plaintiff's religious beliefs were not against the admission of blacks, but barring unmarried blacks from enrollment was, in plaintiff's judgment, the safest, easiest, and most reliable method to protect its religious conviction against interracial dating and marriage. In response to the Supreme Court's decision that discriminatory admissions policies of private educational institutions were unlawful, plaintiff amended its admissions policy on

May 29, 1975, to allow the admission of unmarried blacks. Plaintiff continues to adhere to its religious belief forbidding interracial dating and marriage although in its judgment this principle may be more difficult to enforce under the new policy. After May 29, 1975, plaintiff rested upon the following disciplinary rules to protect its religious beliefs:

*There is to be no interracial dating.*

1. Students who are partners in an interracial marriage will be expelled.

2. Students who are members of or affiliated with any group or organization which holds as one of its goals or advocates interracial marriage will be expelled.

3. Students who date outside their own race will be expelled.

4. Students who espouse, promote, or encourage others to violate the University's dating rules and regulations will be expelled.

Plaintiff's rules regarding interracial dating and marriage constitute a part of the admissions program only insofar as an applicant who is known to the plaintiff to be a partner to an interracial couple would be denied admission.

8. Plaintiff's primary objective is in instructing, conveying, and disseminating its fundamentalist religious beliefs. Although plaintiff performs certain scholastic functions, religion reigns, molding every action, policy, and decision of the plaintiff. Plaintiff's Biblical beliefs permeate every facet of the institution. Education is only one of the means used by plaintiff to indoctrinate people with its Christian principles; religion controls and dominates education.

The fact that plaintiff is not affiliated with any denomination, yet, at the same time, is totally guided by its fundamentalist beliefs, attests that plaintiff is a distinct religious organization in and of itself.

Plaintiff is not an educational appendage of a recognized church that may allude in its educational processes to the beliefs of the parent religious order. Instead, the organizational source of plaintiff's religious beliefs is the university. The convictions of plaintiff's faith do not merely guide its curriculum but, more importantly, dictate for it the truth therein. Bob Jones University cannot be termed a sectarian school, for it composes its own religious order.

The Court finds that plaintiff's primary purpose is religious and that it exists as a religious organization. The institution also serves educational purposes. The Court further finds that during the year 1975 plaintiff religious organization was organized and operated exclusively for religious and educational purposes.[1]

### CONCLUSIONS OF LAW

1. This Court has jurisdiction under the provisions of 26 U.S.C. § 7422 and 28 U.S.C. § 1346(a)(1).

2. By this action plaintiff seeks the refund of $21.00 that it paid in taxes on one employee for the calendar year of 1975 under the Federal Unemployment Tax Act (F.U.T.A.), 26 U.S.C. § 3301. Plaintiff bases its claim upon the contention that it qualifies as an exempt organization under 26 U.S.C. § 501(c)(3), and is, therefore, exempted under 26 U.S.C. § 3306(c)(8) from paying F.U.T.A. taxes. Viewed in light of its actual significance, this suit serves as plaintiff's method of obtaining judicial review of the Internal Revenue Service's revocation of its earlier determination letter that plaintiff was an exempt organization under § 501(c)(3).

In support of its position the plaintiff argues that the IRS's revocation of its tax exempt status was unlawful and beyond the powers delegated it by Congress, because plaintiff meets the express provisions of

---

1. Two other Courts have noted the predominance of religion in descriptions of plaintiff. The Fourth Circuit characterized plaintiff as a "fundamentalist religious organization . . ." *Bob Jones University v. Connally,* 472 F.2d 903, 904 (4th Cir. 1973). The Supreme Court stated

that "the University is devoted to the teaching and propagation of its fundamentalist religious beliefs." *Bob Jones University v. Simon,* 416 U.S. 725, 734, 94 S.Ct. 2038, 2045, 40 L.Ed.2d 496 (1974).

§ 501(c)(3)[2] and the related regulations, 26 C.F.R. § 1.501(c)(3)–1. Plaintiff also attacks the revocation as being unconstitutional in that it violates plaintiff's First Amendment right to the free exercise of its religious beliefs and its Fifth Amendment rights to due process and equal protection of the law.

To justify its revocation of plaintiff's tax exempt status, the defendant contends that plaintiff does not meet the specifications of § 501(c)(3) as interpreted by the IRS and delineated in Revenue Rulings and Procedures 71–447, 72–54, 75–50, and 75–231. In these rulings the IRS announced that, under its recent interpretation of the law, schools which racially discriminated would no longer qualify for tax exempt status. The Service outlined in these releases certain criterion (for example, requiring the school to show affirmatively that it does not racially discriminate and has publicized such policy) that would entitle the organization to exempt status.

The IRS determined that plaintiff did not meet these new guidelines and revoked its exempt status back to the date plaintiff was formally notified of the change in interpretation of the law. In particular, as to the year in question, 1975, defendant asserts plaintiff maintained a racially discriminatory admissions policy and that the midyear modification of plaintiff's admissions procedures did not remedy its deficiencies. Defendant argues that plaintiff still has not complied at this time because plaintiff's internal rules against interracial dating and marriage are discriminatory and constitute an integral part of its admissions policies.

The reconsideration and revocation of plaintiff's exempt status stems from a decision by the IRS to construe § 501(c)(3) as requiring religious and educational organizations to be charitable in nature. Defendant contends the legislative intent behind this exemption section was to afford exemptions only to those organizations that could be considered charitable under the common law and such law precludes an organization which violates clearly declared federal public policy from being considered charitable. Defendant continues its rationale by asserting that there exists a clearly declared public policy against discrimination by schools on the basis of race in the selection of students. Therefore, according to defendant, since it has appraised plaintiff's admissions procedures to be racially discriminatory, it argues that the law impels it to revoke plaintiff's favorable standing under § 501(c)(3).

Defendant also argues a judicially created rule of construction that Congress may not be presumed to have intended to encourage violations of public policy. If defendant confers tax exempt status on an organization which violates public policy, defendant contends that it would thus be interpreting the statute contrary to its legislative intent.

As stated earlier, plaintiff not only contests the defendant's construction of the statute but argues that enforcement of the statute, as interpreted by the government, against plaintiff, violates its constitutional rights.

## THE APPLICABILITY OF DEFENDANT'S INTERPRETATION OF SECTION 501(c)(3) TO THE PLAINTIFF

The defendant's policy of revoking tax exempt status set forth in Revenue Rulings and Procedures 71–447, 72–54, 72–50, and 75–231, applies only to educational organizations. The Court is well aware that there is substantial authority to support a finding

---

**2.** 26 U.S.C. § 501(c)(3) lists as exempt organizations:

Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office.

that there exists a federal public policy which condemns racial discrimination in educational institutions; however, the Court concludes there is no corresponding clearly declared federal public policy against the practice of racial discrimination by religious organizations such as plaintiff.

 The position of defendant is that an organization's principal activity governs the category into which it must fall for purposes of § 501(c)(3). Whether an organization is created and operated exclusively for exempt purposes is a question of fact. *Haswell v. United States,* 500 F.2d 1133, 1142 (Ct.Cl.1974). The Court has found as a fact that the principal activity of the plaintiff rests in the instruction, advancement, and propagation of its religious beliefs. Since plaintiff is categorized for purposes of § 501(c)(3) as a religious organization, defendant's declared procedure for denying tax exempt status to educational organizations that partake in racial discrimination is inapplicable to plaintiff.

 The plaintiff was organized and operated in the year of 1975 exclusively for religious and educational purposes, the predominate purpose being religious. Both of these purposes are decreed exempt purposes under § 501(c)(3). An organization that is organized and operated exclusively for one or more of such exempt purposes may be exempt. 26 C.F.R. § 1.501(c)(3)–1(d)(iii). Assuming defendant's construction of the statute that exempt organizations must not violate clearly declared public policy, the Court detects that no such policy is violated by plaintiff religious organization. Defendant does not contend nor does the Court find that plaintiff is disqualified under the remaining provisions of the statute and the corresponding regulations. Therefore, the Court concludes that for the year 1975 plaintiff was a tax exempt organization under § 501(c)(3) and, for that reason, was not liable by reason of § 3306(c)(8) for F.U.T.A. taxes during that period.

Whether the IRS's policy of denying exemptions to educational organizations that racially discriminate applies to plaintiff · is merely one of several important issues presented that concern the Court and merit further discussion. The revocation of plaintiff's exempt status on the basis of defendant's interpretation of § 501(c)(3) has drastic consequences, both legally and in actual effect. The most severe is that defendant's interpretation of § 501(c)(3), which it attempts to impose upon plaintiff, creates an impermissible intrusion of its First Amendment rights and usurps the power of Congress to legislate the federal tax laws.

## THE COMPATIBILITY OF DEFENDANT'S INTERPRETATION OF § 501(c)(3) WITH THE FIRST AMENDMENT

3. The sensitive nature of First Amendment rights has long been recognized, and the judiciary has been vigilant in the protection of these rights. In the present case plaintiff alleges that defendant's revocation of its tax exempt status violates its right to the free exercise of religion guaranteed under the First Amendment.[3] Briefly stated, the issue is whether defendant's revocation of plaintiff's tax exempt status, because of policies founded on plaintiff's religious beliefs, unconstitutionally infringes upon plaintiff's right to the free exercise of religion.

 The religious belief involved is plaintiff's conviction that the Bible forbids interracial dating and marriage and that God has cursed any acts in furtherance thereof. Defendant's revocation of plaintiff's tax exemption for 1975 resulted from its determination that during this time plaintiff maintained an admissions policy which discriminated on the basis of race. Until May 29, 1975, plaintiff refused to accept the admissions applications of single blacks. After plaintiff altered its admissions policy on that date to permit the acceptance of single blacks, defendant asserts plaintiff continued racial discrimination in its admissions

---

3. The First Amendment to the Constitution, in part, provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

procedure. Defendant reaches this conclusion by stating that discrimination against a person on account of the race of that person's spouse or companion is contrary to expressed public policy, and that this alleged unlawful discrimination in plaintiff's internal rules was an integral part of plaintiff's admissions policy ·after May 29, 1975.

Even were this Court to assume plaintiff is primarily an educational organization, it cannot agree with defendant that revocation of plaintiff's exempt status for the period beginning after May 29, 1975, because of plaintiff's admissions policy, does not violate plaintiff's free exercise rights. The Court need not rule on this constitutional claim in relation to plaintiff's admissions policy earlier that year, because the question is more sharply presented for the time period after May 29, 1975.

At some point in scrutinizing actions surrounding the practice of a religion, a distinction must be made between actions related to a particular religious belief and the actual practice of the belief itself. In the present case, plaintiff's refusal to admit single blacks was not plaintiff's expression of its religious conviction, though the policy was based on and enacted to protect its religious beliefs. Plaintiff's prohibition of interracial dating and marriage and its refusal to approve or, in any way, encourage such conduct are the practice of its religious beliefs. Plaintiff's disciplinary rules as to interracial dating constitute the practice of its religious convictions. These rules are a direct manifestation of plaintiff's religious beliefs, and any interplay between these rules and plaintiff's admissions policy does not remove their fundamental religious nature. Thus, defendant revoked plaintiff's tax exemption for the period after May 29, 1975, because of the direct practice by plaintiff of its religious beliefs.

■■ The limitations imposed upon the government by the free exercise clause of the Constitution were expressed by the Supreme Court in *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963):

The door of the Free Exercise Clause stands tightly closed against any governmental regulation of religious *beliefs* as such, *Cantwell v. Connecticut*, 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213, 1217, 128 ALR 1352. Government may neither compel affirmation of a repugnant belief, *Torcaso v. Watkins*, 367 U.S. 488, 81 S.Ct. 1680, 6 L.Ed.2d 982; nor penalize or discriminate against individuals or groups because they hold religious views abhorrent to the authorities, *Fowler v. Rhode Island*, 345 U.S. 67, 73 S.Ct. 526, 97 L.Ed. 829; . . . 374 U.S. 398, 402, 83 S.Ct. 1790, 1793, 10 L.Ed.2d 965, 969.

There can be no doubt that denial of tax-exempt status to the plaintiff for the period after May 29, 1975, because of its rules regarding interracial dating and marriage penalized the plaintiff for the exercise of its religious beliefs. Plaintiff suffered not only taxation of its income but also a substantial loss of contributions since they were no longer tax deductible. That the burden imposed on the free exercise of religion may be characterized as being only indirect does not preclude the religious practice from protection under the First Amendment. *Braumfield v. Brown*, 366 U.S. 599, 607, 81 S.Ct. 1144, 1148, 6 L.Ed.2d 563, 568 (1961). To condition the availability of benefits upon plaintiff's willingness to violate a cardinal principle of its religious faith effectively penalizes the free exercise of its constitutional liberties. *Sherbert v. Verner*, 374 U.S. 398, 406, 83 S.Ct. 1790.

■ A burden on First Amendment values is constitutionally permissible only if justifiable in terms of the government's valid aims. *Gillette v. United States*, 401 U.S. 437, 462, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971). The governmental interest advanced by the regulation must be a "compelling state interest" to pass constitutional muster, for it is "basic that no showing merely of a rational relationship to some colorable state interest [will] suffice." *Sherbert v. Verner*, 374 U.S. 398, 406, 83 S.Ct. 1790, 1795, 10 L.Ed.2d 965.

Defendant argues the interest being protected is the public policy against discrimination on the basis of the race of a person's

companion. See *McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964); *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967). However, these cases, and other cases cited by defendant, manifest a public policy against the state assisting in such discrimination—each decision involved a finding of state action. These decisions do not represent compelling public policy against this variety of racial discrimination in the private sector.

As authority for its position that revocation of plaintiff's tax exemption does not impermissively intrude on plaintiff's free exercise rights, defendant relies on *Goldsboro Christian Schools, Inc. v. United States*, 436 F.Supp. 1314 (E.D.N.C.1977). But, this case is inapposite to the present situation. In *Goldsboro*, the Court was confronted with an admissions policy which totally excluded blacks. The admissions policy of the plaintiff beginning after May 29, 1975, did not exclude blacks; any possible discrimination would have to arise from the practice of its religious belief prohibiting interracial dating and marriage. The secular interest being advanced in *Goldsboro* could be considered compelling, for that interest concerned granting blacks equal access to educational institutions, an interest which this Court earlier recognized was in keeping with clearly declared public policy. On the other hand, this Court can discern no public policy of comparable magnitude with respect to the prohibition of discrimination by private institutions on the basis of the race of one's spouse or companion. Thus, revocation of the plaintiff's tax exempt status after May 29, 1975, constitutes an unconstitutional infringement of plaintiff's right to the free exercise of its religious beliefs.

The Court has discussed the free exercise problem only for the period commencing after May 29, 1975, because, as mentioned earlier, this constitutional question is more acutely presented during this time span. The constitutional problem presented by defendant's revocation is so severe that, as the Court has just shown, such conduct is not sustainable even if it is assumed plaintiff is an educational organization. This Court determines plaintiff to be a religious organization, and there has yet to be expressed any compelling public policy prohibiting racial discrimination by religious organizations. Once plaintiff opened its doors to single blacks on May 29, 1975, regardless of whether it be classified as a religious or educational institution, the defendant's revocation of its tax exempt status violated plaintiff's First Amendment right to the free exercise of religion.

In addition, the Court discerns that the construction of § 501(c)(3) advocated and applied by the defendant in this case seriously risks violation of the Establishment Clause of the First Amendment. The legal theories behind defendant's interpretation of the section and Rev.Rul. 71–447 are twofold: one, that organizations seeking exemption for "religious" or "educational" purposes must also qualify under the common law as being "charitable", and two, that Congress did not intend to permit tax benefits to organizations which operate in contravention of sharply defined national policies.

Defendant's first mentioned legal position would deny exempt status for the plaintiff on the theory that Congress, in passing the predecessors of § 501(c)(3), intended to grant exemptions only to those organizations that could be termed "charitable" under the law of charitable trusts. The separate enumeration of other purposes in the statute, according to defendant, occurred as a result of the exercise of an abundance of caution on the part of Congress. Defendant then turns to the law of charitable trusts to support its revocation of plaintiff's tax exemption because such law disallows charitable status to organizations whose purposes or policies violate law or clearly declared federal policy.

The second legal basis for revoking plaintiff's tax exempt status proceeds on the theory that Congress will not be presumed to have intended conferral of tax benefits to institutions that operate contrary to clearly declared federal policy. See *Tank*

*Truck Rentals v. Commissioner,* 356 U.S. 30, 78 S.Ct. 507, 2 L.Ed.2d 562 (1958). Thus, both legal theories, which defendant employs to maintain its construction of § 501(c)(3), rely on its interpretation that Congress intended to limit application of the statute to organizations whose activities comport with clearly defined federal policy.

Conflict with the Establishment Clause lurks within defendant's construction of the exemption provision because defendant puts no limit on its application. All religious organizations, such as plaintiff, are to be denied tax exemptions unless the IRS has judged the organization's purposes and practices to be in line with expressed federal policy. Under the government's reading of the statute, only those religious organizations, whose purposes and practices are in harmony with those of the federal government, will be granted an exemption. To preserve its tax exemption, a church, or other religious organizations, such as plaintiff, would have to make sure it stayed in step with federal public policy.

The Supreme Court in *Walz v. Tax Commission of the City of New York,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), determined that the granting of property tax exemptions equally to *all* churches did not run afoul of the Establishment Clause. *Walz* considered the across-the-board granting of exemptions to churches and did not address the situation presented by the case at bar where defendant's interpretation of the statute requires denying exemption to some churches while granting it to others. The application of the law, in the manner which defendant construes it, results in the government favoring those churches that adhere to federal policy, more specifically, in this case, those churches whose religious beliefs do not forbid interracial marriage.

■ In *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971), the Supreme Court reiterated its well known test for determining if a statute contravenes the Establishment Clause:

First, does the Act reflect a secular legislative purpose? Second, is the primary effect of the Act to advance or inhibit religion? Third, does the administration of the Act foster an excessive government entanglement with religion?

403 U.S. 672, 678, 91 S.Ct. 2091, 2095, 29 L.Ed.2d 790.

Although the purpose of the government's construction of § 501(c)(3) may be considered secular in nature in that it promotes federal public policy, a primary effect is the inhibition of those religious organizations whose policies are not coordinated with declared national policy and the advancement of those religious groups that are in tune with federal public policy. Instead of all religious organizations being on the same footing as was the case in *Walz,* the government's construction of the section would saddle the burden of taxation only on those religious organizations whose procedures conflict with federal public policy. One form of the oppression of religion by government is the taxation of it. *Committee for Public Education v. Nyquist,* 413 U.S. 756, 793, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973).

In *Nyquist,* the Court struck down a New York tax statute designed to assist parents who sent their children to parochial schools for having the effect of advancing religion. In so doing the Court commented as follows:

Special tax benefits, however, cannot be squared with the principle of neutrality established by the decisions of this Court. 413 U.S. 756, 793, 93 S.Ct. 2955, 2975, 37 L.Ed.2d 948.

The construction of § 501(c)(3) argued by the government would do away with the general grant of tax exemptions to all religious organizations, which was found in *Walz* to constitute an act of benevolent neutrality, and, in effect, transforms the statute into a law that provides a special tax benefit, because favorable tax status will be accorded only to some, not all, religious organizations. Since only selected religious institutions would receive exemption under defendant's interpretation of the law; tax exemption provided by the section no longer manifests neutrality towards all religions but, rather, favors some over others. The effect is to strengthen those religious

organizations whose religious practices do not conflict with federal public policy and to discriminate against those religious groups whose convictions violate these secular principles. The unavoidable effect is the law's tending toward the establishment of the approved religions.

Regarding the element of entanglement, defendant, through its interpretation of § 501(c)(3), seeks the approval of this Court to indulge in the extensive entanglement which, the *Walz* Court decided, is avoided by across-the-board exemptions to religious organizations. Under defendant's theory, the government would be required to monitor continually the practices of all religious organizations to determine their entitlement to exemption. This Court, however, need not further speculate as to whether defendant's interpretation of the statute results in an unlawful entanglement between government and religion, since it has already concluded that implementation of defendant's construction of the section would have the impermissible effect of discriminating between religions. *Committee for Public Education v. Nyquist,* 413 U.S. 756, 794, 93 S.Ct. 2955, 37 L.Ed.2d 948.

The decisions relied upon by defendant to support its reading of § 501(c)(3) fail to consider defendant's interpretation of the statute as applied to religious organizations and how such interpretation could be sustained under the Establishment Clause. *Green v. Connally,* 330 F.Supp. 1150 (D.D.C. 1971) (three judge court), aff'd per curiam sub nom. *Coit v. Green,* 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971);[4] *Goldsboro Christian Schools, Inc. v. United States,* 436 F.Supp. 1314 (E.D.N.C.1977). The statute, when applied as it is written, engages the government in a constitutionally approved act of neutrality, preserving a healthy separation of church and state. On the other hand, defendant's construction of the statute, by supplying an economic advantage to those religions which conform to federal public policy, leads, in many respects, to an identity between church and state.

## DEFENDANT'S INTERPRETATION OF § 501(c)(3) IN RELATION TO THE POWER DELEGATED IT BY CONGRESS.

4. Defendant acknowledges that the limitation which it has attached to the § 501(c)(3), that an organization qualifying under one or more of the listed exempt purposes may be denied exemption if its practices violate public policy, has no support in the language of the section. The construction which the IRS has placed on § 501(c)(3) troubles this Court. The sole legal basis for defendant's revocation of plaintiff's tax exempt status and its promulgation of Revenue Rulings and Procedures 71–447, 72–54, 75–50, and 75–231, is defendant's construction of § 501(c)(3). This Court concludes that defendant's interpretation cannot be sustained and that this deficiency establishes an additional ground for ruling in favor of plaintiff.

The enumeration of exempt purposes in § 501(c)(3) is plain and unambiguous—"religious, charitable, scientific, testing for public safety, literary, or educational purposes, . . . ." The corresponding regulations speak with equal clarity and state, in part, as follows:

(d) *Exempt Purposes*—(1) *In general.* (i) An organization may be exempt as an organization described in section 501(c)(3) if it is organized and operated exclusively for one or more of the following purposes:

(*a*) Religious,
(*b*) Charitable,
(*c*) Scientific,
(*d*) Testing for public safety,
(*e*) Literary,
(*f*) Educational, or
(*g*) Prevention of cruelty to children or animals.

\* \* \* \* \* \*

---

**4.** During the course of the litigation of *Green,* the defendant adopted plaintiff's position, and, thus, the decision was not the outcome of a true adversarial contest. The Supreme Court has noted that its affirmance in *Green,* for this reason, lacks the precedential weight of a case involving a truly adversary controversy. *Bob Jones University v. Simon,* 416 U.S. 725, 740, n. 11, 94 S.Ct. 2038, 40 L.Ed.2d 496.

(iii) Since each of the purposes specified in subdivision (i) of this subparagraph is an exempt purpose in itself, an organization may be exempt if it is organized and operated exclusively for any one or more of such purposes. 26 C.F.R. § 1.501(c)(3)–1(d)(1), (2).

Both the statute and the related regulation separately enumerate the various exempt purposes as being independent and sustaining. This Court must sustain the regulation because it is neither unreasonable nor plainly inconsistent with the revenue statute. *DeTreville v. United States,* 445 F.2d 1306, 1311 (4th Cir. 1971).

The interpretation of the section invoked by defendant to revoke plaintiff's exempt status acts to place a limitation or condition on the section's express terms. Plaintiff religious organization is organized and operated exclusively for religious and educational purposes, yet defendant denies it exempt status. The device that defendant utilizes to place a condition on the unqualified language of the statute is the legal principle that taxing statutes are construed to give effect to legislative intent. Applying this rule of construction to the present case, defendant reaches the conclusion that the intent of Congress was not to grant exempt status to those organizations, otherwise qualifying, whose policies violate federal public policy.

The Courts, which have interpreted § 501(c)(3) as restricted to those organizations .in accord with federal policy, base their rationale on the judicial precept that congressional intent in providing tax deductions and exemptions is not construed to be applicable to activities that are illegal or contrary to public policy. *Green v. Connally,* 330 F.Supp. 1150, 1161 (D.D.C.1971), *Goldsboro Christian Schools, Inc. v. United States,* 436 F.Supp. 1314, 1318 (E.D.N.C. 1977). In so construing the statute, these Courts refused to premise their conclusion upon defendant's alternate theory in support of its position, mentioned earlier, that

Congress, in setting forth the various exempt purposes, intended to require qualification under the law of charitable trusts. With all due deference to the Courts in *Green* and *Goldsboro,* this Court believes that these decisions did not fully consider the nature of the limitation they engrafted on the statute.

In deciding that tax exemptions were not intended to be granted to organizations which violate public policy, both the Court in *Green* and in *Goldsboro* rely on the Supreme Court's opinion in *Tank Truck Rentals v. Commissioner,* 356 U.S. 30, 78 S.Ct. 507, 2 L.Ed.2d 562 (1958). The *Tank Truck* decision involved public policy as the basis for denying deduction of specific expenses; it did not concern public policy as the basis for denying the complete exemption of an organization due to a select practice of it. The defendant has failed to bring to this Court's attention any judicial decisions, other than *Green* and *Goldsboro* where this public policy rationale has been used to deny exemptions.[5] Nevertheless, the *Tank Truck* decision is instructive in the present case.

In *Tank Truck,* the taxpayer sought to deduct, as a business expense, amounts paid in fines occurring in the course of its business for violations of a state penal statute. After finding that allowing this deduction would encourage violations of state law, the Supreme Court defined the scope of the public policy limitation as follows:

This is not to say that the rule as to frustration of sharply defined national or state policies is to be viewed or applied in any absolute sense. *"It has never been thought . . . that the mere fact that an expenditure bears a remote relation to an illegal act makes it non-deductible." Commissioner v. Heininger,* supra (320 U.S. 467 at 474 [64 S.Ct. 249, at page 253, 88 L.Ed. 171]). Although each case must turn on its own facts, *Jerry Rossman Corp. v. Commissioner* (CA2) 175 F.2d 711, 713, *the test of nondeductibility*

5. *Universal Life Church, Inc. v. United States,* 372 F.Supp. 770 (E.D.Cal.1974), cited by defendant, did not expressly adopt defendant's interpretation of § 501(c)(3) but, instead, decided that, even under defendant's interpretation, plaintiff qualified for tax exempt status.

*always is the severity and immediacy of the frustration resulting from allowance of the deduction.* The flexibility of such a standard is necessary if we are to accommodate both the congressional intent to tax only net income, and the presumption against congressional intent to encourage violation of declared public policy. [Emphasis Added]. 356 U.S. 30, 35, 78 S.Ct. 507, 510, 2 L.Ed.2d 562.

Thus, assuming that permitting a deduction closely compares to granting an exemption as the defendant argues, the Court must analyze the facts of this case to determine if conferral of exempt status to plaintiff severely and immediately frustrates national policy.

■ A comparison of the facts of this case with the criterion established by the Supreme Court for invoking the public policy exception immediately reveals an absence of the close relationship required to exist between the tax benefit and the frustration of federal policy. In *Tank Truck,* the Supreme Court found that allowing deduction of fines for illegal acts would frustrate a state policy in severe and direct fashion by reducing the "sting" of the penalty and encouraging violations. To the contrary, permitting tax exempt status to plaintiff does not so act as to encourage plaintiff to discriminate on the basis of race. Plaintiff's racial views result from sincerely held religious beliefs. Regardless of plaintiff's tax status, its religious beliefs remain immutable. The relationship between plaintiff's exemption and a national public policy against discrimination is simply too remote. In instances where a de-

duction has been denied on the ground of this public policy limitation, the relationship between the questioned expense and the applicable policy has been sufficiently close that allowance of the deduction directly and in a significant manner frustrates the clearly defined policy such as where the expenditure itself is illegal or is paid as a penalty for an unlawful act. *Tank Truck Rentals v. Commissioner,* 356 U.S. 30, 35, 36, 78 S.Ct. 507, 2 L.Ed.2d 562. See also, Annot. 27 A.L.R.2d 498 (1953). The mere fact that a taxpayer, who receives a tax benefit, has violated public policy does not, by itself, require a denial of the tax benefit.

Thus, the judicially created "public policy" limitation is much restricted [6] and not applicable to situations, such as the case at bar, where the relationship between the tax benefit and the proscribed conduct is tenuous. The nature of this relationship is crucial to the application of the doctrine but was not examined by the Court in *Green* or *Goldsboro.*[7] The defendant ignores this required nexus in advocating a construction of § 501(c)(3) that any organization, seeking exemption, whether its purpose be religious, educational or otherwise, must comport with clearly defined federal policy. Defendant requires no relationship between the unlawful conduct and the exemption. According to defendant's application of the public policy limitation expressed in *Tank Truck,* exempt status would be denied to any church that somehow committed a violation of a federal statute, a recognized expression of declared federal policy, because defendant's theory requires no showing of any relation between conferral of the

---

6. The Supreme Court expressed its view that the doctrine should be confined rather than expanded, as the defendant attempts to do, in application of *Commissioner v. Tellier,* 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966):

> But where Congress has been wholly silent, it is only in extremely limited circumstances that the Court has countenanced exceptions to the general principle reflected in the Sullivan, Lilly, and Heininger decisions [which permitted deduction of expenses qualifying under the terms of the statute despite conduct of the taxpayer that was contrary to public policy]. . . . The present case

falls far outside that sharply limited and carefully defined category.
383 U.S. 687, 693–694, 86 S.Ct. 1118, 1122, 16 L.Ed.2d 185.

7. The following excerpt from the *Goldsboro* opinion illustrates the decision's failure to take into consideration the relationship between the tax benefit and the actual frustration of a clearly defined federal policy:

> It cannot be assumed that Congress intended to confer this encouragement, however *indirect,* to organizations which actively violate declared national policy. [Emphasis added].
436 F.Supp. 1314, 1318.

exemption and frustration of the federal policy.

The relationship between the tax benefit and the proscribed conduct in the present case is similar to that in *Commissioner v. Tellier,* 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966). In *Tellier* the Supreme Court determined that legal fees incurred by the taxpayer in the unsuccessful defense of a criminal prosecution involving the taxpayer's business did not fall within the "public policy" exception. The taxpayer in *Tellier* was exercising his constitutional right to counsel; plaintiff in the instant case is exercising its First Amendment right to the free exercise of religion as manifested by its racial policies. The taxpayer's exercise of his constitutional right in *Tellier* was held not to frustrate any public policy. Similarly, in the present case, in the absence of any showing that allowance of an exemption to the plaintiff will itself act to dilute severely and directly public policy, the application of the "public policy" exception is not warranted.

 On a related matter, defendant argues that the circumstances are more compelling in the present case than in *Tank Truck* for employing the public policy limitation. Defendant's contention is that in *Tank Truck* the Court had to balance public policy considerations against the competing consideration of legislative intent to tax only net income, while in the present case, defendant asserts, there exists no comparable countervailing consideration with respect to § 501(c)(3).

This Court disagrees with defendant and detects that there does exist a competing consideration underlying § 501(c)(3) that must be weighed against public policy limitations. Defendant recognizes in its argument that the legislative intent behind this section was that exemptions should be granted to those organizations formed for the listed purposes, because they provide a reciprocal benefit to the public. The desire of Congress not to tax religious and educational organizations that, presumptively, benefit society does represent a competing consideration in this case to counterbalance the presumption against congressional intent to encourage violation of declared public policy.[8] As to defendant's theory that the public policy exception expressed in *Tank Truck* supports its interpretation of § 501(c)(3), the case in dispute must undergo, and this Court so performed, the same rigorous analysis required by Supreme Court in *Tank Truck* for determining the applicability of this limited doctrine.

 The *Tellier* decision not only instructs concerning the public policy exception but also makes an important pronouncement involving the federal income tax laws in general that, in this Court's opinion, especially pertains to the case at bar. In defining the scope of the tax law, the Court decreed the following:

We start with the proposition that the federal income tax is a tax on net income, not a sanction against wrongdoing. That principle has been firmly imbedded in the tax statute from the beginning. One familiar facet of the principle is the truism that the statute does not concern itself

8. In the course of defendant's argument that there is no competing consideration to offset the public policy exception, defendant suggests that, because it has determined plaintiff racially discriminates, plaintiff does not benefit the public and, thus, does not merit exemption. The Court considers defendant's logic on this point as somewhat of a nonsequitur, seemingly stemming from its confusion of the terms "public policy" and "public benefit". The two are not synonymous. Public policy is many faceted, one facet of which is that society may provide relief from taxation to those organizations, such as plaintiff religious organization, that are of benefit to the public. The good resulting to the public from these groups depends upon the fulfillment of their purposes. Because one of these organizations may have, in an area of its operations, engaged in conduct that might not have been completely in line with some other aspect of public policy does not automatically mean the public no longer benefits from the organization. Defendant seems to imply that a change in plaintiff's policies to conform to defendant's guidelines would transform the religious organization from one that did not benefit the public into one that did, although the function and purposes of plaintiff remain unchanged throughout.

with the lawfulness of the income that it taxes.

383 U.S. 687, 691, 86 S.Ct. 1118, 1120, 16 L.Ed.2d 185.

The deduction and exemption provisions of the Code, where Congress has been wholly silent, are to be applied equally without regard to whether the taxpayer has committed an illegal act or violated public policy. Only under very limited circumstances, later pointed out in the *Tellier* opinion, where there exists a direct correlation between allowance of the tax benefit and direct, actual frustration, or encouragement of such frustration, of a clearly defined governmental policy, will public policy preclude bestowing the tax benefit.

The Court reads the above quote from *Tellier* as the Supreme Court's admonishment of defendant not to use the tax laws as a means of enforcing other laws and public policies if the revenue statute makes no mention of such conduct or if there does not exist a tight nexus between the tax benefit and the alleged unlawful conduct. The defendant's blanket policy announcements in Revenue Rulings and Procedures 71–447, 72–54, 75–50, and 75–231, that it will deny tax exempt status to organizations which racially discriminate, but otherwise qualify under § 501(c)(3), constitute a use by the IRS of the federal tax law as a sanction for what it considers a wrongdoing, or its idea of proper social conduct of persons of different races, uses of the Code prohibited by the Supreme Court. The underlying purpose of these Revenue Rulings and Procedures is so clear as not to require scrutiny of the taxpayer on a case by case basis to determine the relationship between permission of the exemption and its role in severely and immediately frustrating public policy, as is required by the Supreme Court to trigger the public policy exception.

In these administrative pronouncements the IRS, in effect, announced that it will implement § 501(c)(3) on the basis of whether the taxpayer has abided by federal law or public policy. The section is to become the IRS's mechanism for disciplining wrongdoers or promoting social change.

The Supreme Court ruled in *Tellier* that use of the tax laws for the former purpose is improper and it follows that the same rule would apply to the latter. In addition, the Court is concerned with the many dangers inherent in defendant's interpretation that exemptions may be revoked for violations of federal public policy. Federal public policy is constantly changing. When can something be said to become federal public policy? Who decides? With a change of federal public policy, the law would change without congressional action—a dilemma of constitutional proportions. Citizens could no longer rely on the law of § 501(c)(3) as it is written, but would then rely on the IRS to tell them what it had decided the law to be for that particular day. Our laws would change at the whim of some nonelected IRS personnel, producing bureaucratic tyranny.

This Court has brought to light the legal and administrative problems presented by defendant's construction of § 501(c)(3) because the Court finds this construction is not supported by any theory defendant advances to show that legislative intent warrants its interpretation. The Court has already, at length, commented on why the judicially created presumption against congressional intent to encourage violations of federal policy does not apply to the present case. The Court also rejects defendant's other basis for its construction of the section—that the original legislative history behind the section indicates that Congress, although it separately stated the several exempt purposes, intended only to exempt those organizations which could qualify as charitable under the common law.

 Congress' individual listing of exempt purposes within § 501(c)(3) strongly suggests that it intended to make each of the enumerated purposes an exempt purpose in itself. Defendant, without reference to the actual legislative history in support of its contention asks this Court to rule that the separate enumeration of "religious" and "educational" is superfluous and redundant because the term "charitable" includes the former two terms. Absent any specific legislative history sustaining de-

fendant's contention, the Court will not indulge in such a construction of the section. It is not " 'permissible to construe a statute on the basis of a mere surmise as to what the Legislature intended and to assume that it was only by inadvertence that it failed to state something other than what it plainly stated'." *United States v. Deluxe Cleaners and Laundry, Inc.,* 511 F.2d 926, 929 (4th Cir. 1975). Moreover, if a statute admits a reasonable construction which gives effect to all its provisions, this Court may not adopt a strained reading which renders one part a mere redundancy. *Jarecki v. G. D. Searle & Co.,* 367 U.S. 303, 307–308, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961).

■ Defendant fails to bring forth any legislative history that would compel this Court to depart from these cardinal rules of statutory construction. Those cases, which defendant cited in support of its interpretation, referred to the common law to construe the term "charitable", as used in the Act, and did not rule that Congress intended that organizations, qualifying for the other listed exempt purposes, must also qualify as being charitable under the common law. *Pennsylvania Co. for Insurance on Lives, Etc. v. Helvering,* 62 App.D.C. 254, 66 F.2d 284 (1933); *Girard Trust Co. v. Commissioner,* 122 F.2d 108 (3rd Cir. 1941). These decisions approved reference to the law of charitable trusts to construe a word, "charitable", within the statute, not to construe the entire section as defendant now seeks. This Court finds no indication that Congress intended to exempt only those organizations that are "charitable". In light of the plain, unambiguous language of § 501(c)(3) this Court must give effect to those exempt purposes specified besides "charitable" and rule that organizations seeking exemption for such purposes need not also qualify as being "charitable".[9]

■ Since both of defendant's alternate theories regarding legislative intent fail to support restricting § 501(c)(3) exempt status to organizations whose practices are in unison with federal public policy, defendant's construction of the law is unfounded. Furthermore, the statute contains no language creating the limitation contended by defendant. Although plaintiff satisfies the written requirements of § 501(c)(3), defendant has revoked its exemption. Thus, the IRS in this case and in its policy pronouncements, as exemplified by Rev.Rul. 71–447, has enacted in substance and effect a change in the law.

In enforcing a construction of the statute which is unwarranted by its legislative history or express terms, the IRS has overstepped its authority and usurped that of Congress. In *Manhattan General Equipment Co. v. Commissioner,* 297 U.S. 129, 56 S.Ct. 397, 80 L.Ed. 528, (1935), the Supreme Court clearly delineated the bounds of an agency's power:

> The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that

---

**9.** The meager amount of legislative history which this Court has been able to undercover concerning the original predecessor of § 501(c)(3) does not suggest that "religious" and "educational" were intended to be synonymous with "charitable". During the House debate in 1913 on the Bill that became the first modern income tax law, an amendment was offered to add "scientific" and "benevolent" to the list of types of corporations exempted under the Bill, which already exempted religious, charitable, or educational corporations. Rep. Hull, in speaking for the Bill, opposed the amendment by stating:

> Of course any kind of society or corporation that is not doing business for profit and not acquiring profit would not come within the meaning of the taxing clause of paragraph G. So I see no occasion whatever for undertak-

ing to particularize, because we could find innumerable kinds of these charitable or educational or other organizations called by different names, and there would be no end to it.
50 Cong.Rec. 1306

"Charitable" and "educational" are spoken of as different types of nonprofit organizations covered by the exemption clause; the terms are used in an exclusive, not inclusive sense. It cannot be concluded from this passage that exempt status under the clause was to be limited only to corporations meeting the definition of "charitable" under the law of charitable trusts.

[Subsequently, the Senate amended the Act so that in its final form it did include "scientific". 50 Cong.Rec. 3856. 38 Stat. 172.]

end is not the power to make law—for no such power can be delegated by Congress—but the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity.

297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528.

"This reasoning applies with even greater force to the Commissioner's rulings and acquiescences." *Dixon v. United States,* 387 U.S. 68, 75, 85 S.Ct. 1301, 1305, 14 L.Ed.2d 223 (1965). By altering the law in the present case, the IRS has attempted to exercise a power that is reserved only to Congress. The rulings and procedures which the IRS has used to change the law are a nullity. The revocation by the IRS of plaintiff's tax exempt status under its misinterpretation of § 501(c)(3) is unlawful and unconstitutional.

It is the province of Congress, not the IRS, to make the federal tax laws. The law that Congress has passed in this instance is clear and unambiguous, and this Court will give it effect. Should Congress desire to change the law, it may so do in keeping with the Constitution. This Court cannot, and will not, approve changes in the law by an administrative agency that completely bypass the legislative process.

## CONCLUSION

5. Having determined that revocation of plaintiff's tax exempt status by defendant was improper under defendant's own rulings and procedures, violated plaintiff's First Amendment rights, and resulted from the Treasury's exceeding those powers delegated to it, the Court determines that it is unnecessary to examine further claims made by plaintiff. For the foregoing reasons, the Court concludes plaintiff was entitled to exemption for the calendar year of 1975 under § 501(c)(3) and is, therefore, entitled, pursuant to § 3306(c)(8) of the Act, to judgment against defendant for the amount of $21.00 representing a refund of the F.U.T.A. tax previously paid.

AND IT IS SO ORDERED.