639 F.2d 147
 81-1 USTC P 9124
 BOB JONES UNIVERSITY, Appellee,
v.
UNITED STATES of America, Appellant.
BOB JONES UNIVERSITY, Appellee,
v.
UNITED STATES of America, Appellant.
BOB JONES UNIVERSITY, Appellee,
v.
W. Michael BLUMENTHAL, Secretary of the Treasury and Jerome
Kurtz, Commissioner of Internal Revenue, Appellants.
 Nos. 79-1215, 79-1216 and 79-1293.
 United States Court of Appeals,
Fourth Circuit.
 Argued March 3, 1980.
Decided Dec. 30, 1980.
As Corrected Jan. 19, 1981.
 
 Leonard J. Henzke, Jr., Tax Div., Dept. of Justice, Washington, D. C. (M. Carr Ferguson, Asst. Atty. Gen., Washington, D. C., Thomas E. Lydon, U. S. Atty., Columbia, S. C., Gilbert E. Andrews, Tax Div., Dept. of Justice, Washington, D. C., on brief) for appellant.
 Wesley M. Walker, Greenville, S. C. (J. D. Todd, Jr., O. Jack Taylor, Jr., Natalma M. McKnew, Leatherwood, Walker, Todd & Mann, Greenville, S. C., John C. Stophel, Stophel, Caldwell & Heggie, Chattanooga, Tenn., on brief) for appellee.
 Before WIDENER and HALL, Circuit Judges; and MERHIGE*, District Judge.
 K. K. HALL, Circuit Judge:
 
 
 1
 Bob Jones University conducts "an institution of learning for the general education of youth in the essentials of culture and in the arts and sciences, giving special emphasis to the Christian religion and the ethics revealed in the Holy Scriptures...."[1] Its religious teachings include a strict prohibition against interracial dating and marriage. The admissions and disciplinary policies used to enforce this belief have resulted in the loss of the University's tax exempt status, which we are now asked to review.
 
 
 2
 Bob Jones University (taxpayer) brought this action to recover Twenty-One Dollars which it paid in 1975 under the Federal Unemployment Tax Act (FUTA).[2] The government counterclaimed for FUTA taxes for the taxable years 1971 through 1975 in the amount of $489,675.59, plus interest. The district court concluded, on both statutory and constitutional grounds, that the IRS was without authority to revoke the University's tax-exempt status. Bob Jones University v. United States, 468 F.Supp. 890 (D.S.C.1978). We reverse.
 
 I.
 A. The University and its Racial Policies
 
 3
 Bob Jones University was founded in Florida in 1927. It moved to Greenville, South Carolina in 1940 and has been incorporated there as an eleemosynary institution since 1952. Taxpayer is not affiliated with any religious denomination, but maintains a fundamentalist orientation in its educational approach. It is a religious institution in its own right, as well as an educational one.
 
 
 4
 Taxpayer accepts students from kindergarten through college and graduate school. It enrolls about five thousand students and offers some fifty accredited degrees, in addition to its nondegree Institute of Christian Service. All courses, however, are taught according to Biblical Scripture. Teachers are required to be "born again" Christians; students are screened as to their religious beliefs and their conduct is strictly regulated.
 
 
 5
 Bob Jones University believes that the Scriptures forbid interracial marriage and dating. Prior to 1971, it completely excluded blacks. From 1971 to May, 1975, taxpayer accepted no applications from unmarried black students, with the exception, since 1973, of staff members who had been at the University four years or longer. Following this court's decision in McCrary v. Runyon, 515 F.2d 1082 (4th Cir. 1975) (reh. den. May 29, 1975), aff'd 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), prohibiting racial exclusion from private schools, taxpayer revised its policy. After May 29, 1975, unmarried blacks were permitted to enroll, but a disciplinary rule was added to prevent racial intermarriage and dating.
 
 There is to be no interracial dating
 
 6
 1. Students who are partners in an interracial marriage will be expelled.
 
 
 7
 2. Students who are members of or affiliated with any group or organization which holds as one of its goals or advocates interracial marriage will be expelled.
 
 
 8
 3. Students who date outside their own race will be expelled.
 
 
 9
 4. Students who espouse, promote, or encourage others to violate the University's dating rules and regulations will be expelled.
 
 B. THE IRS' non-discrimination policy
 
 10
 Prior to 1970, the Internal Revenue Service extended tax exempt status under § 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3) to all private schools, regardless of racial policy. In 1970, however, black Mississippi parents and children obtained a preliminary injunction prohibiting the IRS, pendente lite, from according tax-exempt status to private schools in Mississippi which discriminated on the basis of race. Green v. Kennedy, 309 F.Supp. 1127 (D.D.C.1970). The IRS later announced nationally that it would no longer allow charitable contributions and deductions, 26 U.S.C. § 170(c)(2), and tax exempt status, § 501(c)(3), to racially discriminatory schools, including church-related schools.
 
 
 11
 On June 30, 1971, the three judge district court in Green ruled that the issuance of tax exempt status to racially discriminatory private schools was illegal, and issued a permanent injunction enjoining the Commissioner of Internal Revenue from approving tax exempt status to any school in Mississippi that does not publicly maintain a policy of nondiscrimination. Green v. Connally, 330 F.Supp. 1150 (D.D.C.1971). That decision was affirmed by the Supreme Court in Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971) (per curiam).
 
 
 12
 Following the Green decision, the Service formalized the nondiscrimination policy in several rulings. Rev.Rul. 71-447, 1971-2 Cum.Bull. 230; Rev.Proc. 72-54, 1972-2 Cum.Bull. 834. The 1972 procedures were superseded in 1975 by Rev.Proc. 75-50, 1975-2 Cum.Bull. 587, see also Rev.Rul. 75-231, 1975-1 Cum.Bull. 158 (nondiscrimination requirement for church operated schools). Revenue Procedure 75-50 provides that in order to qualify under section 501(c) (3), a private school must be able to show that all of its programs and facilities are operated in a nondiscriminatory manner.[3]
 
 
 13
 Bob Jones University is subject to the Revenue procedures prohibiting racial discrimination in private schools. The University is an educational institution as well as a religious one. See 26 C.F.R. § 1.501(c)(3)-1(d)(3) (educational defined), and the rulings and procedures promulgated by the Service apply to all private schools. We decline to create an exception for religion-based schools where the Service has made none.
 
 
 14
 We, therefore, must address two questions. Does the IRS have the statutory authority to deny tax exempt status to Bob Jones University because of its racial policies and, if so, does the denial contravene the First Amendment to the Constitution of the United States?
 
 II.
 
 15
 Statutory Authority for the Nondiscrimination Condition
 
 
 16
 The district court found that the University was entitled to the section 501(c)(3) exemption because "its primary purpose is religious and it exists as a religious institution." 468 F.Supp. at 897. The court reasoned that since the statute and the regulations enumerate seven distinct tax exempt purposes, one of which is "religious," see 26 C.F.R. § 1.501(c)(3)-(d)(1)(iii), the exemption must be granted once it has been established as a fact that the institution fits one of those enumerated categories.
 
 
 17
 This simplistic reading of the statute, however, tears section 501(c)(3) from its roots. In Green v. Connally, 330 F.Supp. 1150 (D.D.C.1971), aff'd per curiam sub nom. Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971), a three judge district court held "(t)he code must be construed and applied in consonance with the federal public policy against support for racial segregation of schools, public and private." 330 F.Supp. at 1163.[4] Accordingly, it upheld the application of the IRS's nondiscrimination condition to private schools in Mississippi which practiced racial discrimination.[5]
 
 
 18
 In that persuasive and scholarly opinion, Judge Leventhal viewed section 501(c)(3) against its background in the law of charitable trusts, concluding that to be eligible under that section, an institution must be "charitable" in the broad common law sense,[6] and therefore must not violate public policy. Green, supra, 330 F.Supp. at 1156-60.
 
 
 19
 The legislative history of § 501(c)(3) verifies the exemption's foundation in public policy.
 
 
 20
 The exemption from taxation of money and property devoted to charitable and other purposes is based upon the theory that the Government is compensated for the loss of revenue by its relief from financial burden which would otherwise have to be met by appropriations from other public funds, and by the benefits resulting from the promotion of the general welfare. H.R.Rep.No.1820, 75th Cong.3d Sess. 19 (1939). (emphasis added)
 
 
 21
 Accordingly, it is appropriate that the Service interpreted section 501(c)(3) in a manner that reflects its purpose and history. Moreover, as the Green court noted, tax benefits such as deductions and exclusions generally are subject to limitation on public policy grounds. In Tank Truck Rentals v. Commissioner, 356 U.S. 30, 78 S.Ct. 507, 2 L.Ed.2d 562 (1958), the Court upheld the service in disallowing the deduction of fines paid for violations of highway weight limits under the "ordinary and necessary" business expense provision of the Code, 26 U.S.C. § 162. The allowance of the claimed deduction, the Court held, would frustrate the purpose of the State weight law by diluting the punishment imposed. The court held that the expense could not be deemed a "necessity" if allowing the deduction would frustrate "sharply defined" public policy. 356 U.S. at 33, 78 S.Ct. at 509.
 
 
 22
 Bob Jones University's racial policies violated the clearly defined public policy, rooted in our Constitution, condemning racial discrimination and, more specifically, the government policy against subsidizing racial discrimination in education, public or private.
 
 
 23
 Bob Jones' pre-May 1975 policy excluding unmarried black students violated public policy by subjecting black persons to restrictions which were not imposed on whites. In Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1975), the Supreme Court held, in a non-religious setting, that the equal right to contract provision, 42 U.S.C. § 1981, prohibits racial discrimination in non-public school admission policies. Similar considerations apply in a religious setting. In Bob Jones University v. Roudebush, 529 F.2d 514 (4th Cir. 1979) affirming Bob Jones University v. Johnson, 396 F.Supp. 597 (D.S.C.1974), we upheld the denial of Veterans Administration assistance to Bob Jones University and its students under Title VI of the Civil Rights Act, 42 U.S.C. § 2000d et seq., because of this policy of excluding unmarried blacks. See also Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973).
 
 
 24
 The University's post-May 1975 policy applies equally to both black and white students; nevertheless, it too constitutes racial discrimination. That discrimination on the basis of racial affiliation or companionship is a form of racial discrimination is clear from Equal Protection cases such as Loving v. Virginia, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (law prohibiting interracial marriage unconstitutional) and McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) (interracial cohabitation law invalid), as well as § 1981 decisions, see Tillman v. Wheaton Haven Recreational Association, 410 U.S. 431, 93 S.Ct. 1090, 35 L.Ed.2d 403 (1973) (white club member expelled for bringing black guests); Faraca v. Clements, 506 F.2d 956 (5th Cir. 1975) cert. denied 422 U.S. 1006, 95 S.Ct. 2627, 45 L.Ed.2d 669 (1976) (white man denied employment because wife was black).
 
 
 25
 We think the Service acted within its statutory authority in revoking Bob Jones University's tax exempt status because of these policies.
 
 
 26
 The University asserts, however, that this situation is special because its racial policies are grounded in sincere religious faith and therefore immutable; with or without the exemption it will maintain its present policy. The district court agreed, finding that the relationship between the exemption and the frustration of public policy against discrimination was too remote to bring the case within the narrow Tank Truck exception to deductibility. 468 F.Supp. at 903-04.
 
 
 27
 This argument misses the mark for two reasons. First, we are not here confronted with a computational provision designed "to tax earnings and profits less expenses and losses." Tank Truck, supra, 356 U.S. at 33, 78 S.Ct. at 509. Unlike section 162, section 501(c)(3) is rooted in public policy considerations wholly apart from the "broad basic policy of taxing 'net, not * * * gross, income.' " Id. (citations omitted) The public policy limitation, therefore, need not be so narrowly applied.
 
 
 28
 Second, the nondiscrimination policy assures that Americans will not be providing indirect support for any educational organization that discriminates on the basis of race. Cf. Norwood v. Harrison, supra.[7] The fact that the religious belief is sincere, and the policy immutable in this case does not obviate the need for a prophylactic rule to prevent such support.
 
 III.
 The First Amendment
 
 29
 Our approval of the government's interpretation of § 501(c)(3) brings us to the question whether application of the nondiscrimination policy to Bob Jones University violates the Free Exercise and Establishment clauses of the First Amendment.
 
 A. The Free Exercise Clause
 
 30
 The University contends that the IRS's nondiscrimination policy violates its right to freely practice its religion because it is forced to give up a valuable government benefit in order to practice its religious beliefs. Assuming that the revocation of § 501(c)(3) status does impinge upon the University's practice to some extent, see Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1962), the question remains one of balancing giving due consideration to the weight of the interests asserted by the government and the extent and nature of the burden on the religious practice and the religion as a whole. See, Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). See also, Note, 1981 after Runyon v. McCrary: The Free Exercise Right of Private Sectarian Schools to Deny Admission to Blacks on Account of Race, 1977 Duke L.J. 1219, 1240-1266.
 
 
 31
 The government interest in eliminating all forms of racial discrimination in education is compelling. See, e. g., Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954). It extends to private action as well as public, Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1975), and has a special vitality where the integration of public schools has made private education attractive to those who would try to turn back the clock.
 
 
 32
 Government must "steer clear" of any expression of support for racial discrimination in education. See Norwood v. Harrison, supra, 413 U.S. at 467, 93 S.Ct. at 2811.
 
 
 33
 In Bob Jones University v. Roudebush, 529 F.2d 514 (4th Cir. 1979) (per curiam), affirming Bob Jones University v. Johnson, 396 F.Supp. 597 (D.S.C.1974), we recognized that the government interest in eliminating all racial discrimination in education was sufficiently compelling to justify denial, under Title VI of the Civil Rights Act, of Veterans Administration (V.A.) benefits to Bob Jones University and its students. The policy involved in that case was the same religiously based pre-1965 policy involved here: the denial of admission to unmarried blacks. The district court rejected the University's Free Exercise claim, stating:
 
 
 34
 It is clear that the Free Exercise Clause cannot be invoked to justify exemption from a law of general applicability grounded on a compelling state interest.
 
 
 35
 396 F.Supp. at 607; we affirmed.
 
 
 36
 In Goldsboro Christian Schools v. United States, 436 F.Supp. 1314 (D.S.C.1977), the government's policy of denying tax exempt status to private racially discriminatory schools survived Establishment Clause challenge by a school that excluded blacks because of its religious proscription of racial intermarriage. See also Green v. Connally, supra, 330 F.Supp. at 1169; Brown v. Dade Christian Schools, 556 F.2d 310, 314-24 (5th Cir. 1977) (concurring opinion of Judge Goldberg).
 
 
 37
 The government interest in this case is compelling, when applied to the post-May 1975 policy of strict limitations on racial companionship as well as to the pre-May 1965 policy of excluding unmarried blacks. As discussed in part II, supra, the clear federal policy against racial discrimination applies to all forms of racial discrimination governmental or private, absolute or conditional, contractual or associational.
 
 
 38
 In contrast, the government's rule would not prohibit the University from adhering to its policy.[8] Abandonment of the policy would not prevent the University from teaching the Scriptural doctrine of nonmiscegenation. Nor is any individual student at Bob Jones University forced to personally violate his beliefs; no student is forced to date or marry outside of his race. We think these factors tip the balance in favor of the Services' nondiscrimination doctrine. See generally, Note, Section 1981 after Runyon v. McCrary: The Free Exercise Right of Sectarian Schools to Deny Admission To Blacks on Account of Race, 1977 Duke L.J. 1219; Racial Exclusion by Religious Schools, Brown v. Dade Christian Schools, Inc., 91 Harv.L.Rev. 879 (1978). Comment, The Tax Exempt Status of Sectarian Educational Institutions That Discriminate on the Basis of Race, 65 Iowa L.Rev. 258 (1979).
 
 B. The Establishment Clause
 
 39
 The nondiscrimination policy also passes muster under the Establishment Clause. The Establishment Clause requires that a law reflect a secular legislative purpose, have a primary effect that neither advances nor inhibits religion, and avoid excessive entanglement with religion. Committee for Public Education and Religious Liberty v. Regan, 444 U.S. 646, 100 S.Ct. 840, 846, 63 L.Ed.2d 94 (1980); Committee for Public Education v. Nyquist, 413 U.S. 756, 773, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973); Tilton v. Richardson, 403 U.S. 672, 678, 91 S.Ct. 2091, 2095, 29 L.Ed.2d 790 (1971). The secular purpose of the rulings in question is unassailable. Taxpayer asserts, however, that the result is both the unconstitutional advancement of certain religions and government excessive entanglement in religious practices.
 
 
 40
 The district court perceived an Establishment Clause conflict created by the government's denial of tax exemption to religions which would not "stay in step" with expressed federal policy. Thus, it held "the application of the law in the manner which defendant construes it, results in government favoring those churches that adhere to federal policy, more specifically, in this case, those churches whose religious beliefs do not forbid interracial marriage." 468 F.Supp. at 900.
 
 
 41
 We agree that the Government must maintain an attitude of neutrality toward all religions. Gillette v. United States, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168 (1971); Walz v. Tax Commission of New York, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).[9] But certain governmental interests are so compelling that conflicting religious practices must yield in their favor. Thus the court has upheld statutes prohibiting polygamy, Reynolds v. United States, 98 U.S. 145, 25 L.Ed. 244 (1878), or sale of religious materials by minors, Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), even though they "favor" religions that do not engage in such practices. In Braunfield v. Brown, 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d 563 (1961), the Court upheld Sunday closing laws, which made the practice of orthodox Jewish merchants' beliefs more expensive" because of the strong state interest in providing one uniform day of rest for all workers." Again, certain religions were "favored," but the First Amendment was not violated.
 
 
 42
 We respect the district court's concern that religions not be required always to "stay in step with expressed federal policy." The Establishment Clause protects against such intrusion. Walz, supra 397 U.S. at 674, 90 S.Ct. at 1414. But the principle of neutrality embodied in the Establishment Clause does not prevent government from enforcing its most fundamental constitutional and societal values by means of a uniform policy, neutrally applied. See Gillette, supra.
 
 
 43
 Finally, the government's rulings do not create the kind of excessive entanglement with religion recently avoided in National Labor Relations Board v. Catholic Bishop of Chicago, 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979). In Catholic Bishop, the Supreme Court held that the National Labor Relations Act did not require Roman Catholic religious schools to permit their lay teachers to hold representation elections, and rejected NLRB jurisdiction over alleged unfair labor practices involving such schools. The Court noted that to hold otherwise would present a significant risk that the First Amendment would be infringed. Id., 99 S.Ct. at 1320. First, it would often require inquiry into the good faith of the position asserted by the clergy administrators and by the school's religious mission. Second, the Board would be called upon to decide what are "terms and conditions of employment" an inquiry that would involve the Board in "nearly everything that goes on in the schools." Id. (emphasis added)
 
 
 44
 In contrast, the scope of government involvement in this case is much narrower; the only inquiry is whether the school maintains racially neutral policies. And, the uniform application of the rule to all religiously operated schools avoids the necessity for a potentially entangling inquiry into whether a racially restrictive practice is the result of sincere religious belief. Compare, Brown v. Dade Christian Schools, supra. The provision in question involves minimum intrusion into the operation of the school while serving important government interests.[10]
 
 IV.
 
 45
 In conclusion, we hold that the revocation of Bob Jones University's tax exempt status violates neither the statutory mandate of section 501(c)(3) of the Internal Revenue Code nor the First Amendment to the Constitution of the United States. The judgment of the district court is reversed with instructions to dismiss the University's claim for refund of 1975 FUTA taxes, and to reinstate the government's claim for the years 1971 to 1975 and enter appropriate judgment thereon for defendant.
 
 
 46
 REVERSED AND REMANDED WITH INSTRUCTIONS.
 
 WIDENER, Circuit Judge, dissenting:
 
 47
 I respectfully dissent.
 
 
 48
 While I agree with the result obtained by, and much of the opinion of, the district court, I would decide the case in a somewhat different setting. and I disagree in large extent with the analysis of the majority as well as its result.
 
 
 49
 To begin with, Bob Jones, which antedates by decades the decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), is a "fundamentalist religious organization." Bob Jones University v. Connally, 472 F.2d 903, 904 (4th Cir. 1973). That has been held in this circuit when the same question now before us was before the court in a tax injunction case, and is confirmed by the extensive and correct findings of fact of the district court which are summarized just below.
 
 
 50
 "Plaintiff is not an educational appendage of a recognized church that may allude in its educational processes to the beliefs of the parent religious order. Instead, the organizational source of plaintiff's religious beliefs is the university. The convictions of plaintiff's faith do not merely guide its curriculum but, more importantly, dictate for it the truth therein. Bob Jones University cannot be termed a sectarian school, for it composes its own religious order.
 
 
 51
 "The Court finds that plaintiff's primary purpose is religious and that it exists as a religious organization. The institution also serves educational purposes. The Court further finds that during the year 1975 plaintiff religious organization was organized and operated exclusively for religious and educational purposes." 468 F.Supp. 890 at 895.
 
 
 52
 Indeed, the Supreme Court in affirming Bob Jones University v. Connally, supra, stated "The university is devoted to the teaching and propagation of its fundamentalist religious beliefs." Bob Jones University v. Simon, 416 U.S. 725, 734, 94 S.Ct. 2038, 2044, 40 L.Ed.2d 496 (1974).
 
 
 53
 Accepting the foregoing findings of the district court as correct, and even the majority does not claim they are clearly erroneous, and the previous findings of this court and the Supreme Court, as we must, that Bob Jones University is a religious organization, we are dealing in this case not with the right of the government to interfere in the internal affairs of a school operated by a church, but with the internal affairs of the church itself. There is no difference in this case between the government's right to take away Bob Jones' tax exemption and the government's right to take away the exemption of a church which has a rule of its internal doctrine or discipline based on race, although that church may not operate a school at all. In this opinion, I speak not to the abstract wisdom or rightness of such a rule, but to the right of a church to enforce that rule, although it may be repugnant to most of the population, if the rule is a part of its religious doctrine or discipline. The district court found and the government acknowledges that the rule against interracial dating and marriage is a genuine religious belief.
 
 
 54
 In the case before us, we are immediately dealing only with whether or not Bob Jones' rule forbidding interracial dating and marriage may be enforced without losing its tax exemption.
 
 
 55
 Briefly, I think the majority, as well as the Internal Revenue Service and the court in Green v. Connally, 330 F.Supp. 1150 (D.D.C.1971) (three-judge court), affirmed per curiam sub nom. Coit v. Green, 404 U.S. 997, 92 S.Ct. 564, 30 L.Ed.2d 550 (1971), misconstrued 26 U.S.C. § 501(c)(3).[1] I would construe § 501(c)(3) to grant Bob Jones University its exemption for "religious" purposes. That being true, there is no reason to test the grant of an exemption for educational purposes, because the exemption for religious purposes has not only the protection of the First Amendment, but its authorization. Walz v. Tax Commission, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970), especially pp. 677-680, 90 S.Ct. pp. 1415-1417.
 
 
 56
 To say that there is a direct conflict between Bob Jones' First Amendment rights to operate free from government interference and the Fifth Amendment prohibitions against lending financial aid to institutions which practice discrimination, see Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973), is also not correct in this case. That is so because Walz also held that "The grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the State." p. 675, 90 S.Ct. p. 1414. If it be argued that the holding of Walz as to sponsorship was decided in the context of the establishment clause and thus is not applicable here, that holding has been reinforced in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), and Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). In Moose Lodge the court reversed a district court which had canceled the liquor license of Moose Lodge because it refused to serve a drink to a black guest of a member. Its constitution and bylaws limited membership to white males, and the policy and practice was to permit only Caucasian guests on lodge premises. The Court refused to find State action although the club operated with a license from the State of Pennsylvania and the operation of the club was regulated in some particulars by the State. It held that "... the operation of the regulatory scheme enforced by the Pennsylvania Liquor Control Board does not sufficiently implicate the State in the discriminatory guest policy of Moose Lodge to make the latter 'State action' within the ambit of the equal protection clause of the Fourteenth Amendment." p. 177, 98 S.Ct. p. 1744. The Court had previously stated that it had "... never held, of course, that discrimination by an otherwise private entity would be violative of the equal protection clause if the private entity receives any sort of benefit or service at all from the State, or if it is subject to State regulation in any degree whatsoever." p. 173, 98 S.Ct. p. 1742. In Flagg Bros., the Court declined to find State action in a warehouseman's proposed sale of goods as permitted by the New York Uniform Commercial Code. The Court "... rejected the notion that our prior cases permitted the imposition of Fourteenth Amendment restraints on private action by the simple device of characterizing the State's inaction as 'authorization' or 'encouragement' ". pp. 164-165, 98 S.Ct. pp. 1737-1738.
 
 
 57
 Because I feel Bob Jones is entitled to its religious exemption, the only question left is whether the religious exemption, granted by statute, may be revoked by the Revenue Service on the grounds that it is not in accord with public policy. See Tank Truck Rentals, Inc. v. Commissioner, 356 U.S. 30, 78 S.Ct. 507, 2 L.Ed.2d 562 (1958). Such questions as the extent of the protection offered Bob Jones by the First Amendment and the extent of the Fifth Amendment prohibition against aiding educational facilities which are not racially integrated come into play as they are expressions of public policy. The question which I cannot avoid, try as I have done to do so, is whether the admitted public policy of the nation favoring freedom of religion as expressed in the First Amendment is to be limited by a public policy assuring "... that Americans will not be providing indirect support for any educational organization that discriminates on the basis of race."[2] pp. 152-153. I do not find it necessary to deal with an absolute rule that a church may enforce with impunity any rule of its internal doctrine or discipline, no matter how repugnant, to illustrate by way of exaggeration human sacrifice, for that does not exist here. I think it of more than passing interest, however, that discrimination against women on account of their sex exists in many churches. And the same may be said of racial discrimination, probably to less extent. Yet the churches involved are among the oldest and largest of the Christian faiths in this country. The IRS, however, has not chosen to attack the problem from that angle so as to get it settled for the whole country. Rather, it chose a small, isolated, religious organization, not affiliated with a larger denomination and combined with a school, which espouses a concededly unpopular belief that many think unwise and immoral. Thus, it tries its test case here.
 
 
 58
 I think it is this court's reading of the statute, and not the district court's, that "tears section 501(c)(3) from its roots." That section's enumeration of exempt purposes is clear and unambiguous. Organizations are exempt which are "organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes." Each of these is a distinct and separate category. By the rules of statutory construction as well as common sense, the word "or" must be read after each of the listed categories. Even the regulations of the IRS are equally unambiguous and follow the construction I think is dictated by the plain words of the statute. 26 C.F.R. § 1.501(c)(3)-1(d)(1)(i) provides an organization may be exempt "if it is organized and operated exclusively for one or more of the following purposes:
 
 
 59
 (a) Religious,
 
 
 60
 (b) Charitable,
 
 
 61
 (c) Scientific,
 
 
 62
 (d) Testing for public safety,
 
 
 63
 (e) Literary,
 
 
 64
 (f) Educational, or
 
 
 65
 (g) Prevention of cruelty to children or animals." (Italics added.)The regulations also state that "Since each of the purposes specified in subdivision (i) of this subparagraph is an exempt purpose in itself, an organization may be exempt if it is organized and operated exclusively for any one or more of such purposes." 26 C.F.R. § 1.501(c)(3)-1(d)(1)(iii). (Italics added.) All that is necessary, according to both the statute and the regulations promulgated under it is that an organization be organized and operated exclusively for one of the named purposes.
 
 
 66
 The word "charitable" appears in section 501(c)(3) merely as one of the adjectives modifying "purposes." "Charitable" is not used in a generic sense, and is not used as descriptive of the listing of exempt organizations. Rather, "charitable" is itself listed between "religious" and "scientific." It may be, and probably is, because "charitable" is a flexible term, the meaning of which changes to fit a changing society, that Congress specifically exempted certain types of organizations whether or not they qualify as common law charities. See Neuberger & Crumplar, "Tax Exempt Religious Schools Under Attack: Conflicting Goals of Religious Freedom and Racial Integration," 48 Fordham L.Rev. 229, 239-40 (1979). But regardless of the reason, the simple fact is that Congress has enumerated certain exempt purposes, including "charitable," "religious," and "educational." It did not grant exemptions by reference to the law of charitable trusts.
 
 
 67
 Congress, by statute, has provided that certain classes or organizations shall be tax exempt. The district court found as a fact that plaintiff falls within one of those classes. Since that finding is not disturbed, the plaintiff is statutorily entitled to be tax exempt. Neither the IRS nor this court has the power to take away a benefit granted by Congress. The Commissioner may not add a restriction to a statute which is not there, Commissioner v. Acker, 361 U.S. 87, 80 S.Ct. 144, 4 L.Ed.2d 127 (1959); nor may he deprive a taxpayer of a benefit conferred by statute, Brooks v. United States, 473 F.2d 829, 832 (6th Cir. 1973). "The Courts and the Commissioner do not have the power to repeal or amend the enactments of the legislature even though they may disagree with the result; rather, it is their function to give the natural and plain meaning effect to statutes as passed by Congress." National Life and Accident Ins. Co. v. United States, 524 F.2d 559, 560 (6th Cir. 1975).
 
 
 68
 This is a case of first impression so far as the Supreme Court is concerned, as well as the Courts of Appeals. The real issue I think to be decided, as I have indicated before in this opinion, is whether the public policy favoring freedom of religion as expressed in the First Amendment is to be limited by public policy described by the majority as one meaning that Americans will not provide indirect support for any educational organization that discriminates on the basis of race. To put the question even more properly, may the two policies exist side by side, or is each so rigid that it will not accommodate the other? Assuming that the policy against discrimination on account of race is as broad as stated by the majority, I think it is not so rigid that religious organizations, although they may discriminate, may not exist in the same society. For it is the very existence of the religious organization at stake here, the power to tax involving the power to destroy. M'Culloch v. The State of Maryland, 4 Wheat. 316, 431, 4 L.Ed. 579, 607 (1819).
 
 
 69
 In ascertaining what is the public policy of the nation, the Supreme Court has instructed us which are the proper matters to consider in Twin City Company v. Harding Glass Company, 283 U.S. 353, 51 S.Ct. 476, 75 L.Ed. 1112 (1931):
 
 
 70
 "In determining whether the contract here in question contravenes the public policy of Arkansas, the Constitution, laws, and judicial decisions of that State and as well the applicable principles of the common law are to be considered. Primarily, it is for the lawmakers to determine the public policy of the State." 283 U.S. at 357, 51 S.Ct. at 477.
 
 
 71
 Because there is no federal common law which applies to the question at hand, we must consider the Constitution, laws, and judicial decisions of the United States. Primarily, we must consider the Acts of Congress.
 
 
 72
 Those sections of the federal Constitution having application are the First Amendment, of course, and as well the Fourteenth and Fifth Amendments. We consider the First Amendment for its guarantee of religious freedom; the Fourteenth for its guarantee of equal protection of the laws; and the Fifth Amendment as it imposes on the national government under its due process clause the same limits, so far as racial segregation goes in public facilities, as are imposed on the States under the equal protection clause of the Fourteenth Amendment. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).
 
 
 73
 The extent of protection of the First Amendment to religious organizations needs little exposition. It has been called "the transcendent value" in Norwood v. Harrison, 413 U.S. 455, 469, 93 S.Ct. 2804, 2812, 37 L.Ed.2d 723 (1972); and "high 'in the scale of our national values' " in NLRB v. Catholic Bishop of Chicago, 440 U.S. 490, 501, 99 S.Ct. 1313, 1319, 59 L.Ed.2d 533 (1979). And everyone knows the saying, the firstest of the First. In all events, I contend that, with rare exceptions, the freedom of speech, assembly, the press, and religion have always occupied so high a place in the life of the nation that it cannot be doubted that the strongest possible public policy considerations support them. The Fourteenth Amendment also occupies a large place in the scheme of things. Under it Brown v. The Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), was decided with its familiar holding that classification on account of race in the assignment of children to public schools was a violation of the amendment. And that holding has been extended, as we all know, into all fields of State action. Under Bolling, supra, the holding of Brown is extended to actions by the federal government. There is no doubt, then, that there is a public policy favoring freedom of religion and also no doubt that there is a public policy in opposition to discrimination in matters involving State action. But unless something else appears, nothing has been shown to indicate to me that the two policies may not exist side by side. There is no reason I know of that the policy favoring nondiscrimination is so strong that it will not admit the existence of a religious organization which does in fact discriminate.
 
 
 74
 Various statutes of the United States touch on the subject, although none control it directly. Contrary to the majority, I feel that those statutes which throw light on the question are worthy of examination, for, as the Court has said, it is primarily for Congress to determine the public policy of the nation.
 
 
 75
 Besides the tax exemption statute immediately involved, the various Civil Rights Acts should be considered, as well as the Ashbrook Amendment.
 
 
 76
 The Civil Rights Act of 1964 outlawed most forms of racial discrimination in this country. Those provisions of the statute relating to employment and public accommodations are probably the most familiar. But that statute did not provide against discrimination in religious organizations, and, indeed, in 42 U.S.C. § 2000a(e) the statute exempted from the public accommodations title "a private club or other establishment not in fact open to the public." Further, 42 U.S.C. § 2000e-1 exempted from the equal employment title of that Civil Rights Act a religious corporation or association "with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation ... of its activities." In 1972 Congress amended the equal employment title of the statute to require an employer to reasonably accommodate employees' religious practices if such accommodation does not result in undue hardship on the conduct of the employer's business. 42 U.S.C. § 2000e(j).
 
 
 77
 42 U.S.C. § 1981, a part of the post-Civil War Civil Rights Acts has been construed in Johnson v. Railway Express Agency, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975), to prohibit discrimination in private employment; and in Runyon v. McCrary, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976), to prohibit racial discrimination in admission requirements to private secular schools. The statute itself provides, so far as pertinent here, that all persons shall have the same right in every State to make and enforce contracts as is enjoyed by white citizens. Runyon, however, specifically did not decide the question of admission to religious schools. 427 U.S. at 167, 96 S.Ct. at 2592.
 
 
 78
 The Ashbrook Amendment, P.L. 96-74, 93 Stat. 559, § 103, is the most recent expression of Congressional policy touching the question at hand. That amendment to the Appropriations Act provides that none of the funds made available shall be used to carry out any rule, policy, or procedure which would cause the loss of tax exempt status to private religious or church operated schools under § 501(c)(3) unless in effect prior to August 22, 1978. While the amendment itself is prospective in operation as the majority points out, to say that it has no effect on public policy, I think, is simply wrong. It would be equally as wrong, for example, to say the Civil Rights acts have no place in ascertaining the public policy of the nation just because they are not squarely on point. And the same may be said of the exemptions therefrom. The majority, for example, finds support in 42 U.S.C. § 1981, which I freely admit has a bearing on the case. But if the Ashbrook Amendment has no effect on policy because prospective only, then neither does § 1981 because the rule we are immediately concerned with does not come within its literal terms.
 
 
 79
 Not only is the Ashbrook Amendment the most recent expression of Congress, it is the only expression of Congress I know of on the question immediately at hand. It is the law of the land, and it has said in unmistakable terms that the IRS is prohibited from doing precisely what it has done here commencing with August 22, 1978. Were it not for its prospective operation, it would bind us here. So, it is worthwhile to look briefly at the legislative history of the Ashbrook Amendment. The House Committee Report provides in part as follows:
 
 
 80
 The relevant House Committee report states:
 
 
 81
 On August 22, 1978 and February 9, 1978, the Internal Revenue Service proposed a revenue procedure relating to the tax exempt status of private schools. At present the legislative oversight committees of both the House and Senate are considering these proposals. This Committee, too, is concerned about the Internal Revenue Service issuing revenue procedures in an area where legislation may be more appropriate. The responsibility of the Internal Revenue Service is to enforce the tax laws. The purpose of the Internal Revenue Service procedures ought to be to clarify these laws, not to expand them. The issue of tax exempt status of private schools is a matter of far reaching social significance and the Service ought to issue revenue procedures in this area only when the legislative intent is fairly explicit. The Appropriations Committee is unsure that the proposed revenue procedures issued by the Service are the proper expression of that legislative intent. The Committee believes that the Service ought not issue these revenue procedures until the appropriate legislative committees have had a chance to evaluate them and make the determination that the proposed revenue procedures are a proper expression of the tax laws.
 
 
 82
 House Committee on Appropriations, H.R.Rep.No. 96-248, 96th Cong. 1st Sess., at 14-15.
 
 
 83
 And Congressman Ashbrook, the sponsor of the Amendment, stated in the Congressional Record, 96th Cong. 1st Sess. No. 12, June 25-July 13, 1979, at H 5879-80, as follows:
 
 
 84
 For the administrative branch to create such a policy without direction from Congress is a violation of the doctrine of the separation of powers.
 
 
 85
 The Nation's churches and their schools should be free to function without regard to local neighborhood minority mixes or arbitrary "affrmative action" (sic) quota plans. Such Federal overreaching is a violation of the constitutional separation of church and State. Churches and their schools should be free to function without Federal harassment. Citizens should be able to exercise their religious freedom without meddling by the Federal bureaucracy.... The IRS has no authority to create public policy.
 
 
 86
 So long as the Congress has not acted to set forth a national policy respecting denial of tax exemptions to private schools, it is improper for the IRS or any other branch of the Federal Government to seek denial of tax-exempt status....
 
 
 87
 Such policy determinations, when made without the action of Congress, become dangerous encroachments upon congressional authority. Although the Tax Code has often been termed to be an instrument of social policy, it properly becomes such only upon action or lack of action by the Congress....
 
 
 88
 For the IRS to select private schools as targets of its own substantive evaluation and tax exemption denial, while leaving unhampered tax-exempt organizations which practice or promote witchcraft, homosexuality, abortion, lesbianism, and euthanasia leaves this Member confused as to the objectives of those who would make this agency into a powerful instrument to selectively implement social policy....
 
 
 89
 For an agency to permit itself to be guided by pressures of pending legal action, other Federal agencies, outside pressure groups, or changes in an administration is to confuse its own role as tax collector with that of legislator, jurist, or policymaker. There exists but a single responsibility which is proper for the Internal Revenue Service: To serve as tax collector. It is the responsibility of Congress to conduct oversight over this agency to prevent transgressions into legislative authority.
 
 
 90
 Cong.Rec., 96th Cong. 1st Sess., No. 12, June 25, to July 13, 1979, at H 5879-80.
 
 
 91
 The cases which I think touch most directly on the question are to large extent a discussion of the constitutional provisions and statutes I have mentioned, and as they are expressions of public policy in the field, I will discuss them as I think they apply in the ascertainment of what is the public policy of the nation with respect to the question now before us.
 
 
 92
 As I have before pointed out, the Supreme Court has consistently held that the place of First Amendment values in our national order of things is somewhere between transcendent and high. That is emphasized by such cases as Presbyterian Church v. Hull Church, 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969), in which the Court held, in a dispute over church property but which was decided as a question of church doctrine, that the State of Georgia, even through its court system had no right under the First Amendment to resolve "underlying controversies of religious doctrine." The Court said "Thus, the departure-from-doctrine element of the Georgia implied trust theory requires the civil court to determine matters at the very core of a religion the interpretation of particular church doctrines and the importance of those doctrines to the religion. Plainly, the First Amendment forbids civil courts from playing such a role." 393 U.S. at 450, 89 S.Ct. at 606. Thus, if the courts are forbidden to intrude even to the extent of deciding what is the doctrine of a church, that shows the considerable immunity that church doctrine has from judicial or executive inquiry, much less necessary approval. In NLRB v. Catholic Bishop of Chicago, supra, the Court held that the National Labor Relations Board could not compel four parochial schools to bargain collectively with a lay teachers union. Although the teachers were within the literal terms of the labor act, the court held that the danger of serious constitutional questions, a conflict between the labor act and the First Amendment, was so great that it construed the labor act to exclude the teachers. Again, in Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed. 15 (1972), the Court held that those members of the Old Order Amish religion could not be required under compulsory school attendance laws to send their children to school beyond the eighth grade because such violated their religious doctrine.
 
 
 93
 These cases decided under the First Amendment are sufficient to show the extent of protection offered to religious doctrine and that to overcome this protection requires a considerable showing of a compelling state interest.
 
 
 94
 Along a different line, the Court held in Reynolds v. United States, 8 Otto 145, 98 U.S. 145, 25 L.Ed. 244 (1879), that the Mormon religious doctrine of taking more than one wife was not sufficient to exempt a conviction under a bigamy statute enacted by Congress which made bigamy a felony punishable by imprisonment not to exceed five years, as well as a fine. And, in Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), the Court upheld a fine of the custodian of a child 9 years of age for violating the child labor laws of Massachusetts in that she permitted the child to work in offering for sale publications of Jehovahs Witnesses, the selling of which was a part of the doctrine of the church. In Reynolds, the Court considered that religious liberty could not go so far as to "break out into overt acts against peace and good order." 8 Otto at 163, 98 U.S. at 163, 25 L.Ed. at 249. In Prince, the Court considered the right of a State to regulate family life to the extent that it protects the welfare of children. Neither of those considerations is present here. Bob Jones has committed no felony, and a State's right to protect the welfare of its children is simply not in the case. Also not in this case is any expression of public policy manifested by a State statute, criminal or otherwise. Neither does a federal statute directly control the subject at hand. Accordingly, while Reynolds and Prince should be considered in ascertaining what public policy to apply here, they should not be controlling.
 
 
 95
 Freedom of association also enters into consideration in this case. E. g. NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). It must be remembered that no one is compelled to go to Bob Jones University. Entrance there is entirely voluntary. It has not and cannot be shown that Bob Jones competes in any significant way with the public schools. Cf. Norwood as construed in Flagg Bros., 436 U.S. at p. 163, 98 S.Ct. at p. 1737. As the Supreme Court has said in Bob Jones University v. Simon, 416 U.S. 725, 735, 94 S.Ct. 2038, 2045, 40 L.Ed.2d 496 (1974), "Students and faculty are screened for adherence to certain religious precepts and may be expelled or dismissed for lack of allegiance to them." Thus, if the action of the government in granting an exemption to Bob Jones is enough state action to be considered state aid, then the action of the IRS itself in revoking the exemption on public policy grounds is itself "subject to the closest scrutiny." NAACP v. Alabama, at p. 461, 78 S.Ct. at p. 1171. I acknowledge that the First Amendment right of freedom of association was mentioned by the Court in Norwood, which stated that, when manifested by private discrimination, it had never been accorded affirmative constitutional protection accorded the Religious Clauses. And the Court further implied that high on the list of priorities as freedom of association in schools may be, it was not so high as the values inherent in the free exercise clause, 413 U.S. at pp. 469-470, 93 S.Ct. pp. 2812-2813. Thus, if Bob Jones were only a school, it might be argued that Norwood should control this case providing that tax exemption is equated to free textbooks. I also acknowledge that the holding in Norwood may be argued to be that the Fourteenth Amendment prohibition against lending aid to segregated schools is a stronger public policy than freedom of association, nevertheless the right of freedom of association does enter into this case. It is an inescapable part of Bob Jones' background, for, in addition to the First Amendment protections offered to this religious organization in its doctrine and discipline, it has the added protection of the First Amendment protection of freedom of association.
 
 
 96
 Two other cases bear on the question. The first is Moose Lodge v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). The next is University of California Regents v. Bakke, 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978). In Moose Lodge, the Court upheld the right of a Moose lodge in Pennsylvania to racially discriminate in its guests although it operated under a liquor license from the Commonwealth of Pennsylvania and its operation was regulated in some particulars by the State. The Court held that this was not State action. But the importance of the case here is that the grant of a privilege not available to all by the State of Pennsylvania was not enough action by the State to be called State action and be invalid under the Fourteenth Amendment prohibition against actions by States according to racial classification. In Bakke, while the Court disapproved the denial of admission of Bakke to medical school on account of his race, the Court further held that the State had a substantial interest in an admissions program "involving the competitive consideration of race and ethnic origin." The Court reversed the California court's judgment which had enjoined any consideration because of race, p. 320, 98 S.Ct. at p. 2763. It suggested that the Harvard College admissions program would be satisfactory. In that program, Harvard believed that admissions taking race into account would keep Harvard from losing a great deal of its vitality and intellectual excellence. Thus, the holding of Bakke is clear that a consideration of race is in some circumstances permissible. On whatever ground Moose Lodge was decided, its holding is that it is not the public policy of the United States to take the license from a Moose lodge with a segregated guest policy just because it operates under a State license. And that of Bakke is equally clear. Race may be taken into account as a factor in admitting students to a state university for reasons having to do with the vitality of the university and intellectual excellence.
 
 
 97
 Moose Lodge especially, I think, is unanswerable in the public policy context. Can we say in candor that it is more important to the nation to permit a segregated Moose lodge to operate than to permit a segregated religious organization to operate? I think not. Bakke is very nearly equally compelling. Can we say that it is more important to a State university to use race as factor in admitting students to obtain overall vitality and intellectual excellence than to permit Bob Jones to maintain a rule against interracial dating and marriage when that is a part of its religious doctrine? Again, I think not.
 
 
 98
 The First Amendment, while its values may be transcendent, bends from time to time to accommodate the necessities of society. See Near v. Minnesota, 283 U.S. 697, 708, 51 S.Ct. 625, 628, 75 L.Ed. 1357 (1931). And, as Reynolds and Prince illustrate, the First Amendment also bends to accommodate threats to public order and the welfare of children. But I think it is a mistake to say that the public policy of not aiding in any way, no matter how indirect, any segregated activity will not yield in any particular to the First Amendment.
 
 
 99
 While racial quotas are themselves discriminatory, the cases approving them in remedial context in employment cases are too numerous to mention, the most prominent of which, of course, is United Steelworkers of America, AFL-CIO-CLC v. Weber, 443 U.S. 193, 99 S.Ct. 2721, 61 L.Ed.2d 480 (1979). So it is not against the public policy of the United States for courts to lend their aid to discrimination in any form, and thus the policy against racial discrimination bends. The Civil Rights Acts themselves contain accommodations for private clubs, § 2000a(e); for employment of people of a particular religion by a religious association, § 2000e-1; and employees' religious practices which do not result in undue hardship, § 2000e(j). It is easily seen that the public policy of no discrimination as provided in the Acts of Congress also is not inflexible. Weber itself has construed the Civil Rights Act of 1964 to accommodate racial discrimination. With the Constitution, the statutes, and the decisions of the Supreme Court yielding to the demands of society from time to time, especially including religious demands, a "prophylactic rule to prevent such (state) support," p. 153, with no "exception for religion-based schools," p. 150, imposed by the majority, is entirely too inflexible. It places the value of no discrimination protected by the Fourteenth Amendment as a matter of law above the religious protection offered by the First Amendment. I think this is a mistake. Assuming that public policy under the Fourteenth Amendment is correctly stated in the majority opinion, I do not think it is so inflexible that it may not exist side by side with the First Amendment freedoms of the Religious Clauses. I would not deal in such absolutes and would decide only the case before us as is proper in this constitutional setting. Ashwander v. TVA, 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936) (Mr. Justice Brandeis concurring). I would decide that Bob Jones University which is a religious institution may continue to operate in its tax exempt status consistently with a rule which may prevent government aid to secular institutions practicing segregation. I see no need to undertake to apply a prophylactic rule especially for ease of administration as the majority opinion implies is one reason for its holding. pp. 154-155.
 
 
 100
 Although the question of the admission of unmarried black students is more difficult than the rule against racial intermarriage and dating, I would decide that matter the same way for the same reasons I have expressed above.
 
 
 101
 Because I think the public policy analysis disposes of the case, I would not reach the other questions presented, Ashwander, supra, including the very serious question of whether the Revenue Service's revocation of tax exempt status of institutions which do not agree with its idea of public policy is in violation of the establishment clause.
 
 
 102
 I would thus affirm the judgment of the district court.
 
 
 
 *
 Honorable Robert R. Merhige, Jr., United States District Judge for the Eastern District of Virginia, sitting by designation
 
 
 [1]
 As stated in its Preamble, and contained in its Certificate of Incorporation:
 The general nature and object of the corporation shall be to conduct an institution of learning for the general education of youth in the essentials of culture and in the arts and sciences, giving special emphasis to the Christian religion and the ethics revealed in the Holy Scriptures, combating all atheistic, agnostic, pagan and so-called scientific adulterations of the Gospel, unqualifiedly affirming and teaching the inspiration of the Bible (both Old and New Testaments); the creation of man by the direct act of God; the incarnation and virgin birth of our Lord and Saviour, Jesus Christ; His identification as the Son of God; His vicarious atonement for the sins of mankind by the shedding of His blood on the Cross; the resurrection of His body from the tomb; His power to save men from sin; the new birth through the regeneration by the Holy Spirit; and the gift of eternal life by the Grace of God.
 
 
 [2]
 In an earlier action, filed in 1971, taxpayer attempted to enjoin the IRS from revoking its tax exempt status. In Bob Jones University v. Simon, 416 U.S. 725, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974), the Supreme Court held that the Anti-Injunction Act of the Internal Revenue Code, 26 U.S.C. § 7421(a), prohibited such an action, but suggested the procedure employed here. Id. at 746, 94 S.Ct. at 2050
 
 
 [3]
 In 1979, Congress passed the Treasury, Postal Service and General Government Appropriations Act, 1980, Pub.L. No. 96-74, 93 Stat. 559
 That Act provides,
 § 103. None of the Funds made available pursuant to the provisions of this Act shall be used to formulate or carry out any rule, policy, procedure, ... which would cause the loss of tax exempt status to private, religious, or church operated schools under § 501(c)(3) of the Internal Revenue Code of 1954 unless in effect prior to August 22, 1978.
 (emphasis added). Section 615 of the Act specifically prohibited funding of two proposed revenue procedures, 3830-01-M (44 Fed.Reg. 9451, Feb. 13, 1979) and 4830-01 (43 Fed.Reg. 37296, Aug. 22, 1978).
 The effect of the Appropriations Act is clearly prospective and has no effect on the policy as enforced in this case. See also 125 Cong.Rec. H 5879, 5882 (daily ed. July 13, 1979) (Rep. Ashbrooke). Rather, it places a moratorium on new procedures, including the proposed procedures cited in section 615. The provision is discussed more comprehensively in Note, The Judicial Role in Attacking Racial Discrimination in Tax-Exempt Private Schools, 93 Harv.L.Rev. 378 (1979).
 
 
 [4]
 In Bob Jones University v. Simon, supra, 416 U.S. at 740 n.11, 94 S.Ct. at 2047 n.11, the Supreme Court indicated that its affirmance of Green lacks the precedential weight of a case involving a truly adversary appeal to that court. We think the reasoning of the three judge court below, however, is persuasive and not without precedential weight
 
 
 [5]
 In Goldboro Christian Schools v. United States, 436 F.Supp. 1314 (E.D.N.C.1977), the IRS nondiscrimination condition was upheld when applied to a religiously based private school which excluded blacks
 
 
 [6]
 This view finds additional support in the statutory framework itself: Section 170 of the Code, the companion provision to 501(c)(3), places the separately enumerated purposes in that section under the broad heading of "charitable" and permits deduction of contributions made to organizations serving those purposes. 26 U.S.C. § 170(c)(2)(B)
 
 
 [7]
 The grant of tax exempt status to any institution necessarily confers upon it a kind of monetary benefit and constitutes a form of government support. Walz v. Tax Commission, 397 U.S. 664, 674-75, 90 S.Ct. 1409, 1414, 25 L.Ed.2d 697 (1970). The Supreme Court in Walz held that a state property tax exemption for religious organizations evidenced a neutrality toward religion, and the level of government support conferred by the exemption was within permissible limits in light of the fact that "either course, taxation ... or exemption, occasions some degree of involvement with religion." Id. at 674, 90 S.Ct. at 1414. Indirect aid in the form of tax benefits may, in other circumstances, constitute state aid to religion in violation of the Establishment Clause. Committee For Public Education and Religious Liberty v. Nyquist, 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973) ("tax credit" to parents sending children to religious school). The basic tax exemption in this case is, on its face, more like that upheld in Walz, but the government "neutrality" advanced when such exemptions are granted takes on another aspect when the tax benefit goes to a religion-based school which practices, for whatever reason, racial discrimination
 The Constitution commands that government not provide any form of tangible assistance to schools which discriminate on the basis of race. Norwood v. Harrison, 413 U.S. 455, 93 S.Ct. 2804, 37 L.Ed.2d 723 (1973). In Norwood the Court remarked that the permissible scope of assistance to racially discriminatory private schools is even narrower than that permitted under the establishment clause the Constitution is less tolerant of "neutral support" when the underlying effect is to subsidize racial inequality or segregation.
 This is not to say that the tax benefit turns the University's policy into government action for Equal Protection Clause purposes. We do think, however, that government must "steer clear" of affording significant tax support to educational institutions that practice racial discrimination.
 
 
 [8]
 A law which penalizes a person indirectly for practicing his belief may violate the Free Exercise Clause, Sherbert v. Verner, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The indirect nature of the "penalty" is, however, a factor to be considered in the balance
 
 
 [9]
 Walz upheld that New York property tax exemptions for religious organizations, for properties used solely for religious worship, did not violate the Establishment Clause. The Walz opinion permits such exemptions but does not require them
 
 
 [10]
 Taxation itself involves some degree of government involvement, but some degree of involvement is inevitable whether the tax exemption is granted or denied. Walz, supra, 397 U.S. at 674-675, 90 S.Ct. at 1414. We do not think the administration of tax laws or the "hazard of churches supporting government" violate the "excessive entanglement" prong of the Establishment Clause
 
 
 [1]
 In Bob Jones University v. Simon, 416 U.S. 725, 740, n. 11, 94 S.Ct. 2038, 2047, n. 11, 40 L.Ed.2d 496 (1974), the Court indicated that its affirmance of Green lacked the precedential weight of a case involving a truly adversary controversy since the Internal Revenue Service adopted the plaintiff's position during the course of the litigation. In view of Simon, I do not consider the circuit bound by Green when the question is presented, as here, in adversarial context
 
 
 [2]
 For the purpose of this opinion, I assume that such a policy exists as phrased by the majority